**Dalton PREJEAN, Petitioner-Appellant,**

v.

**Frank BLACKBURN, Warden, Louisiana State Penitentiary, Respondent-Appellee.**

No. 83–4548.

United States Court of Appeals, Fifth Circuit.

Oct. 15, 1984.

Johnson, Circuit Judge, dissented and filed opinion.

Thomas E. Guilbeau, Lafayette, La., Steven L. Winter, John Charles Boger, Debevoise & Plimpton, Mitchell A. Karlan, Mar-

tha Olson, John H. Hall, New York City, for petitioner-appellant.

J. Nathan Stansbury, Dist. Atty., Lafayette, La., for respondent-appellee.

Before CLARK, Chief Judge, POLITZ and JOHNSON, Circuit Judges.

CLARK, Chief Judge:

Dalton Prejean, a Louisiana prisoner sentenced to die for the 1977 slaying of a Louisiana State Trooper, appeals from the federal district court's denial of his application of habeas corpus relief. Finding that Prejean has not established a violation of his constitutional rights, we affirm the judgment of the district court.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

In the early morning hours of July 2, 1977, Dalton Prejean, a seventeen year old black youth, left a local night club after a full night of drinking and socializing in neighborhood taverns. Prejean, accompanied by his brother Joseph and two companions, had driven only a short distance in his car when he was pulled over by a Louisiana State Trooper for a traffic violation. The tropper, Donald Cleveland, first asked the four young men to exit the vehicle; he then ordered all but Joseph Prejean to return to their seats. The three complied, but when Trooper Cleveland pushed Joseph Prejean up against the car and began to search him, Dalton Prejean withdrew a .38 caliber revolver from under the car seat and got out of the car. Approaching Cleveland with the gun concealed, Dalton Prejean fired two shots at close range, striking Cleveland. Trooper Cleveland died from the gunshot wounds to his neck and chest. The four young men fled the scene but were apprehended several hours later.

Dalton Prejean was indicted by a Louisiana grand jury on the charge of first degree murder. Defense counsel urged a pretrial motion to suppress "any and all" of Prejean's prior adjudications of juvenile delinquency. The trial court ruled that evidence of Prejean's juvenile record was inadmissible, and ordered the evidence suppressed "insofar as this instant proceeding is concerned, but no further." [1] The State immediately sought a writ of certiorari. The Louisiana Supreme Court denied the writ application, stating that the trial court's evidentiary ruling was correct under state law.

The trial was transferred from Lafayette Parish to Ouachita Parish because of the intense pretrial publicity that the case had generated. In a three-day bifurcated trial, an all-white jury of twelve found Prejean guilty and recommended a sentence of death. The trial judge, bound by Louisiana law to accept the jury's recommendation, sentenced Prejean to death. Thereafter the judge compiled a Uniform Capital Sentence Report, obtained a confidential "sentence investigation report" from the State Department of Corrections, and submitted both to the Louisiana Supreme Court.

On direct appeal, the Louisiana Supreme Court affirmed the conviction and the capital sentence. *State v. Prejean*, 379 So.2d 240 (La.1979), *cert. denied*, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980). Prejean next submitted an application for postconviction relief in the state trial court, urging several new constitutional claims. The court denied all requested relief. Prejean thereafter applied to the Louisiana Supreme Court for Supervisory Writs and a stay of execution. The applications were denied. *State ex rel. Prejean v. Blackburn*, 397 So.2d 517 (La.1981).

Prejean immediately submitted an application for federal habeas corpus relief and sought a stay of the impending execution.

---

**1.** The trial court ruled that the evidence of juvenile adjudication was inadmissible for impeachment purposes, *citing State v. (Harry) Roberts*, 331 So.2d 11, 13 (La.1976), and was inadmissi-

ble to establish proof of a statutory aggravating factor, *citing* 6 La.Rev.Stat.Ann. 13:1580(5) (1974) and La.Code Crim.Pro.Ann. art. 905.4(c).

The federal district court granted a temporary stay, enabling Prejean to present to the Louisiana Supreme Court a previously unexhausted claim. *See State ex rel. Prejean v. Blackburn*, 407 So.2d 1189 (La. 1981). Prejean's fully exhausted petition thus raised for consideration by the federal district court eleven discrete claims of constitutional deprivation. Without holding an evidentiary hearing, the district court examined each claim, found that each lacked merit, and dismissed the application. *Prejean v. Blackburn*, 570 F.Supp. 985 (W.D. La.1983). On appeal, Prejean now raises five claims of constitutional dimension: first, that the death sentence imposed in this instance violates due process because it was affirmed by the Louisiana Supreme Court on the basis of nonrecord prejudicial information; second, that the execution of Prejean for a crime committed at age seventeen would violate an eighth amendment right protecting minors from execution; third, that the Louisiana Supreme Court's inadequate proportionality review of Prejean's sentence violated the eighth amendment; fourth, that Prejean, a black youth convicted of killing a white police officer, was condemned to die as a result of intentional racial discrimination; and fifth, that the district court erred in refusing to grant an evidentiary hearing on Prejean's claim that the prosecutor used peremptory challenges deliberately and systematically to exclude blacks from the petit jury. We granted a stay of execution in order to enable our plenary consideration of this appeal.

## II. CAPITAL SENTENCING IN LOUISIANA

### A. *Louisiana law*

■ Under Louisiana law, a death sentence may be imposed only after the penalty jury considers "any mitigating circumstances" and finds beyond a reasonable doubt that the murder was attended by at least one statutorily defined "aggravating circumstance." La.Code Crim.Pro.Ann. arts. 905.3—5 (West Supp.1982); *State v. Culberth*, 390 So.2d 847, 850 (La.1980). In

the instant case, the aggravating circumstance found by the jury was that Prejean's murder victim was a "peace officer engaged in his lawful duties." *See id.* art. 905.4(b). The verdict must be unanimous. La.Code Crim.Pro.Ann. art. 905.6 (Supp. 1982). When, as here, the jury unanimously agrees on a sentence of death, its recommendation is binding on the trial judge. *Id.* art. 905.8. The trial judge therefore had no choice but to sentence Prejean to death in accordance with the jury's recommendation. *See State v. Prejean*, 379 So.2d 240, 247 (La.1979).

Pursuant to Louisiana's statutory capital sentencing scheme, the Louisiana Supreme Court performs an automatic and mandatory review of each case in which a death sentence has been assigned. La.Code Crim.Pro.Ann. art. 905.9 (Supp.1982). The Supreme Court's appellate jurisdiction in criminal cases extends only to questions of law; the court cannot enter findings of fact. La. Const. Art. V, § 5(c) (1979). The court has adopted the following procedures "to satisfy constitutional criteria for review:"

> **Review Guidelines.** Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
>
> (a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
>
> (b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
>
> (c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

La.S.Ct.Rule 28 § 1; *see* La.Code Crim.Pro. Ann. art. 905.9 (Supp.1982). As an aspect of its "proportionality review," the court performs at a minimum a district-wide comparison of the capital sentences imposed in "similar" cases. La.S.Ct.Rule 28 § 4; *see, e.g., State v. (Elmo Patrick) Sonnier*, 379 So.2d 1336, 1362 (La.1979).

## III. THE DUE PROCESS CLAIM

In conducting its appellate review of Prejean's sentence, the Louisiana Supreme Court received, considered, and used two postsentence reports that had been submitted to it by the trial judge. Neither the confidential sentence investigation report, compiled by an employee of the Louisiana Department of Corrections, nor the Uniform Capital Sentence Report, compiled by the trial judge himself, was admitted at trial. Prejean contends that, in affirming the death sentence in partial dependence on two inherently unreliable postsentence reports, the Louisiana Supreme Court denied him due process of law. Prejean's objection rests on two separate yet related grounds: first, that the court's consideration of both reports enabled it to conduct its appellate review of the arbitrariness, proportionality, and overall excessiveness of the jury's verdict based upon information about which the jury had not known; and second, that in considering the confidential sentence investigation report the court relied on information that was never tested in the forum of the adversarial process.[2]

### A. *Two Postsentence Reports*

After the jury had sentenced Prejean to death and an appeal had been taken, the trial judge submitted to the Louisiana Supreme Court two sentencing reports. The procedure by which the Supreme Court received and considered the two reports—the Uniform Capital Sentence Report and the confidential sentence investigation report—is governed by Louisiana Supreme Court Rule 28. Section three of the Rule provides, in pertinent part:

**Section 3. Uniform Capital Sentence Report; Sentence Investigation Report.**

(a) Whenever the death penalty is imposed, the trial judge shall expeditiously complete and file in the record a Uniform Capital Sentence Report (see Appendix "B"). The trial court may call upon the district attorney, defense counsel and the department of probation and parole of the Department of Corrections to provide any information needed to complete the report.

(b) The trial judge shall cause a sentence investigation to be conducted and the report to be attached to the uniform capital sentence report. The investigation shall inquire into the defendant's prior delinquent and criminal activity, family situation and background, education, economic and employment status, and any other relevant matters concerning the defendant. This report shall be sealed, except as provided below.

(c) Defense counsel and the district attorney shall be furnished a copy of the completed Capital Sentence Report and of the sentence investigation report, and shall be afforded seven days to file a written opposition to their factual contents. If the opposition shows sufficient grounds, the court shall conduct a contradictory hearing to resolve any substantial factual issues raised by the reports. In all cases, the opposition, if any, shall be attached to the reports.

La.S.Ct.Rule 28 § 3; *see* La.Code Crim.Pro. Ann. art. 905.9 (Supp.1982).

### 1. *The Uniform Capital Sentence Report*

In the instant case, the trial judge compiled the UCSR apparently with the assistance of the defense counsel, the district attorney, and an agent of the state department of probation and parole.[3] The UCSR

**2.** It should be noted that Prejean's argument is born of the fourteenth amendment's due process clause, not of the eighth amendment's cruel and unusual punishment clause. This argument focuses not on whether the court's appellate review enabled an arbitrary result proscribed by the eighth amendment, but rather on whether the court committed error in the administration

of its eighth amendment duty such as to constitute a violation of due process of law.

**3.** The UCSR that is included in the record, with defense counsel's objections attached, is not in all respects identical to the UCSR that was attached to the confidential sentence investigation report and submitted to the Supreme Court in a sealed envelope. The trial judge's portion of the

noted Prejean's inferior intelligence range and deficient educational background, his employment record, and certain details concerning Trooper Cleveland, the murder victim. The report listed three juvenile offenses for which Prejean previously had been committed, moreover indicating that two psychological tests had been performed on Prejean during these juvenile commitments, and that an explanation of the results was contained in the confidential sentence investigation report. The UCSR furthermore contained the judge's opinion that the jury had not been influenced by any arbitrary factors, that the sentence was probably not disproportionate, and that, considering (among other factors) the "propensities and history of the offender," the sentence was appropriate.

Prejean's counsel received a copy of the UCSR [4] and submitted written objections to it, alleging that "the conclusion and certain specific portions of the uniform capital sentencing report are patently in error." [5] State R. I, 132. Prejean's counsel attached to the objections the last four pages of Prejean's statement confessing to the crime. The full confession was included in the confidential sentence investigation report; it had been excluded from the jury by virtue of a pretrial motion to suppress. Counsel also attached to his objections, as "exhibits," several documents that traced Prejean's wayward course through the Louisiana Division of Probation and Parole.

### 2. The Confidential Sentence Investigation Report

The confidential sentence investigation report was prepared by the same probation and parole agent of the Louisiana Department of Corrections who prepared "part A" of the UCSR. The report first recited a chronology of Prejean's juvenile record, including Prejean's three escapes from custody, two burglaries, one theft, a "false firearms" offense, truancy charges, and the first degree murder of a taxicab driver committed during the course of an armed robbery. In an effort to furnish details concerning Prejean's "adult" record, the probation officer attached to her confidential report a copy of Prejean's confession to the murder of Trooper Cleveland. As noted above, this confession had been suppressed from the criminal trial.

The confidential sentence investigation report considered Prejean's "social history" in great detail. Some measure of the information contained in the confidential report's discussion of Prejean's social history can be gleaned from the exhibits that defense counsel submitted as attachments to his objections to the UCSR. For example, the confidential sentence investigation report contained excerpts of three psychiatric evaluations performed in 1972, 1974, and 1976. Defense counsel himself submitted, as attachments to his objections to the UCSR, the full text of the latter two evaluations. For the most part, however, the agent's confidential sentence investigation

report (part D) can only be found in the record, State R. I, 188. Apparently the trial judge edited and retranscribed the three sections of the UCSR that were initially completed by the parties and the probation and parole agent. The edited and retranscribed version of the UCSR, accompanied by the trial judge's "part D", was filed in the record pursuant to Rule 28. The unedited version was attached to the confidential sentence investigation report and both were sealed to the public. Despite the differences in the two UCSR's, it is apparent that both the UCSR that is in the record as well as the UCSR contained in the sealed envelope were before the Supreme Court of Louisiana for consideration.

4. It cannot be determined which version of the UCSR, or whether both versions of it, were submitted to Prejean's counsel. See note 3, supra.

5. The trial judge noted in the UCSR that only two statutory mitigating circumstances—Prejean's youth and his intoxication—were presented to the jury. In the written opposition, Prejean's counsel argued that two additional statutory mitigating circumstances found support in the record: Prejean's borderline mental retardation, art. 905.5(b); and the disadvantaged and disturbed environment that molded his character, art. 905.5(h). Counsel also urged that the trial judge had overlooked one prosecutorial ploy that had played to the jury's passion and prejudice. Counsel moreover asserted that the trial judge erred in indicating that a black had been represented on the petit jury.

report consists of the agent's personal observations and impressions of Prejean's family life and immediate social environment. These personal impressions and observations can only be found in the agent's confidential sentence investigation report.

The record does not reflect whether Prejean's counsel was ever furnished a copy of the confidential postsentence investigation report.[6] Prejean's counsel has not represented that he was not furnished a copy. The State has not argued that Prejean has waived the right to object to the report's contents. *See generally Gardner v. Florida*, 430 U.S. 349, 361–62, 97 S.Ct. 1197, 1206–07, 51 L.Ed.2d 393 (1977); *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). We, therefore, presume that the trial judge performed his duty and furnished a copy of the sentence investigation report to Prejean's counsel as required by the Louisiana Supreme Court's rule, and, since the Court reported none, that counsel did not submit to the Louisiana Supreme Court any objections to the report's contents.

### IV.

Prejean relies on *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) and *Presnell v. Georgia*, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978) as support for his due process argument. *Gardner* held that a Florida defendant was denied due process of law when the trial judge imposed the death sentence based in part on confidential presentence report information which the defendant had no opportunity to deny or explain. 430 U.S. at 364, 97 S.Ct. at 1207. The Court based its holding on the defendant's interest in the reliability of any information used in determining whether he should live or die. *Id.* at 359, 97 S.Ct. at 1205. The Court held that this interest outweighed the state's interest in keeping secret information which was important to the sentencing pro-

cess. *Id.* In *Presnell* the Supreme Court refused to allow a reviewing court to piece together elements of a crime different from the one formally charged. Presnell had no notice either in the indictment, in the instructions to the jury, or elsewhere, that the state was relying on his rape of a child to supply the bodily injury element necessary to make his kidnapping of that child a capital offense. Despite the fact that parts of the record might support the various elements, the Supreme Court held that the defendant was entitled to have the jury conclude that each element be found as part of a single offense actually charged and instructed.

The Court's use of the reports in reviewing Prejean's death sentence did not violate the principles established in *Gardner* or *Presnell*. The Louisiana Supreme Court affirmed Prejean's conviction on precisely the charge and proof that was before the jury. *State v. Prejean*, 379 So.2d 240, 242–49 (La.1979). It did so partly on the basis of reviewing the evidence and the verdict of the jury. In this phase of its work, the Supreme Court considered only what was considered by the jury. It also separately conducted a broader statutory review that considered the imposition of capital punishment on this defendant as it related to other similar cases in which the penalty had been imposed and in which it had been withheld.

Prejean, was afforded an adequate opportunity to deny or explain all factual information given to the Supreme Court in the reports. A sufficient challenge could provoke a fact hearing. Any opposition was required to be preserved in the record. The defendant's interest in reliability as defined by the *Gardner* Court, is not affected by whether the information be kept from the sentence imposing court or jury. Rule 28, *id.* 430 U.S. at

---

6. In the objections to the UCSR, State R.I., 132–40, Prejean's counsel stated that "in the sentence investigation report the Court was furnished with a copy of Dalton Prejean's confession." *Id.* at 134. Because Prejean's counsel need not nec-

essarily have learned of the general ingredients of the confidential report by acquiring a copy of the report itself, this statement is, at best, inconclusive.

360–61, 97 S.Ct. at 1206–07 fully protects the defendant's interest in reliability.

■ To require that the Louisiana Supreme Court not use the information in its sentence review violates the state's interest in having as much pertinent information as possible available during the "selection" phase of a capital sentencing procedure. The Louisiana Supreme Court has a legitimate interest in understanding the background histories of persons sentenced to capital punishment. This interest is not in conflict with the court's obligation to review the jury's decision. The court has an obligation to consider (1) whether the sentence was imposed under the influence of passion, prejudice, or other arbitrary factors; (2) whether the evidence supports the finding of a statutory aggravating circumstance; and (3) the proportionality of the sentence. La.Code Crim.Pro.Ann. art. 905.9 (Supp.1982). In carrying out this review, the court explicitly stated that the record evidence supported the finding of an aggravating circumstance and the imposition of the death penalty despite evidence of mitigating circumstances presented to the jury. 379 So.2d at 247–49. In its separate appellate review function, it also found that the sentence was not disproportionate, considering both the crime and the defendant. *Id.* at 248–49 and n. 3. Its discussion of the two reports was supplemental to its discussion of the record evidence. Neither Prejean's interest in the reliability of the information contained in the reports nor his interest in a review of the jury verdict for arbitrariness was violated by this procedure.

## V. THE CRUEL AND UNUSUAL PUNISHMENT CLAIM

Prejean contends that the execution of a youth for an offense committed while he was under the age of eighteen violates the cruel and unusual punishment clause of the eighth amendment, as it transgresses "the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590,

598, 2 L.Ed.2d 630 (1958). In support of this claim, he cites the special concern and treatment for juvenile offenders reflected by juvenile court systems in America; the constitutional requirement established in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) that sentencing authorities in capital cases consider age as a mitigating factor; the decline in the past half century in the number of teenagers executed in the United States; and other evidence tending to demonstrate that both nationally and internationally, the trend is toward elimination of capital punishment for youthful offenders.

No court has ruled that in all cases and under all circumstances, the execution of those who commit capital offenses while under the age of eighteen constitutes cruel and unusual punishment. The Supreme Court had the opportunity to consider this question in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), but decided the case on other grounds. In *Eddings,* the Court held that the state courts improperly refused to consider as a mitigating circumstance the violent family background of a youth who committed murder at the age of sixteen. The Court stated: "Just as the chronological age of a minor is itself a factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing." 455 U.S. at 116, 102 S.Ct. at 877.

■ Nothing in society's standards of decency compel more than consideration of an eighteen year old's youth as a mitigating factor. A survey of state capital punishment statutes provides us with "evidence of the country's present judgment," *Coker v. Georgia,* 433 U.S. 584, 593, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977), concerning the acceptability of the death penalty for such youthful offenders. Of the thirty-nine death penalty statutes now in existence, only six prohibit execution of offenders who committed capital crimes while under age eighteen.[7] Twenty-two

---

7. Cal.Penal Code § 190.5 (West Supp.1982); Colo.Rev.Stat. § 16–11–103(5)(a) (1973); Conn.

other state death penalty statutes provide that age is a mitigating factor to be considered in the sentencing process; [8] all others are obliged by *Eddings* to do the same. The current judgment among state legislatures thus strongly indicates that capital punishment can be imposed on youthful offenders.

## VI. PROPORTIONALITY REVIEW

Prejean also argues that the Louisiana Supreme Court did not conduct a sufficient proportionality review of his case. Specifically, he contends that because the Court limited its review to three dissimilar cases [9] from two districts, the review was inadequate.

■ This argument is meritless. Louisiana Code of Criminal Procedure Article 905.9.1 requires the Louisiana Supreme Court to review all first degree murder cases within the same district being reviewed. The Louisiana Supreme Court considered the relevant first degree murder convictions in the district where the offense occurred and where the trial was held. This procedure satisfies constitutional requirements. *See Pulley v. Harris,* —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Williams v. Maggio,* 679 F.2d 381 (5th Cir.1982) (en banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1982); *Baldwin v. Blackburn,* 653 F.2d 942 (5th Cir.1981), *cert. denied,* 456 U.S. 950, 102 S.Ct. 2021, 72 L.Ed.2d 475 (1982). Certainly the first person convicted of murdering a peace officer in the line of duty

cannot negate an otherwise valid capital sentence because his crime is then unique.

## VII. DISCRIMINATORY APPLICATION

■ Prejean contends that the district court erred in refusing to hear statistical evidence on his claim that he was sentenced to death because of his race and the race of his victim. Prejean claims this error violated both his eighth amendment right to be free from cruel and unusual punishment and his fourteenth amendment right to equal protection of the laws. He argues that he tendered proof which would establish that Louisiana juries act on the basis of race in imposing the death sentence against blacks who have killed a white person. The district court properly rejected Prejean's tender of statistical proof without an evidentiary hearing.

In *Smith v. Balkcom,* 660 F.2d 573, *modified,* 671 F.2d 858, (5th Cir.), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982), the court rejected, without a hearing, a similar attack on the Georgia death penalty statute. The proffer of statistical evidence in *Smith* was predicated on the unsupported assumption that all nonracial variables were equally distributed throughout the reported homicides in Georgia, which formed the basis for the analysis. *Smith* held that unless aggravating circumstances and all other nonracial variables had been accounted for, a racial analysis of the raw data would not be of sufficient evidentiary value. According to *Smith,* the tender of statistical evidence

Gen.Stat.Ann. § 53a–46a(f)(1) (West Supp.1982); Ill.Ann.Stat. ch. 38, § 9–1(b) (Smith-Hurd Supp. 1982); Ohio Rev.Code Ann. § 2929.02(A) (Page 1982); Tenn.Code Ann. § 37–234(a)(1) (Supp. 1982).

**8.** Ala.Code § 13A–5–51(7) (1982); Ariz.Rev.Stat. Ann. § 13–703G.5 (Supp.1982–83); Ark.Stat. Ann. § 41–1304(4) (Supp.1979); Fla.Stat.Ann. § 921.141(6)(g) (West Supp.1983); Ky.Rev.Stat. Ann. § 532.025(b)(8) (Bobbs-Merrill Supp.1982); Md.Ann.Code art. 27, § 413(g)(5) (1982); Mass. Gen.Laws Ann. ch. 279, § 69(b)(5) (West Supp. 1983–84); Miss.Code Ann. § 99–19–101(6)(g) (Supp.1982); Mo.Ann.Stat. § 565.012.3(7) (Vernon Supp.1983); Mont.Code Ann. § 46–18–

304(7) (1981); Neb.Rev.Stat. § 29–2523(2)(d) (1979); Nev.Rev.Stat. § 200.035(6) (1979); N.H. Rev.Stat.Ann. § 630:5 II(b)(5) (Supp.1979); N.J. Stat.Ann. § 2C:11–3(5)(c) (West Supp.1983–84); N.M.Stat.Ann. § 31–20A–6.I (Supp.1981); N.C. Gen.Stat. § 15A–2000(f)(7) (1981); 42 Pa.Cons. Stat.Ann. § 9711(e)(4) (Purdon 1981); S.C.Code Ann. § 16–3–20(C)(b)(7) (Law. Co-op. Supp. 1982); Utah Code Ann. § 76–3–207(1)(e) (Supp. 1982); Va.Code § 19.2–264.4(B)(v) (Supp.1982); Wash.Rev.Code Ann. § 10.95.070(7) (Supp.1983–84); Wyo.Stat. § 6–2–102(j)(vii) (Supp.1980).

**9.** All involved killings of family members; none involved a teenage defendant; and none resulted in a death sentence.

must account for nonracial variables so as to render the statistics "so strong that the results [would] permit no other inference but that they are the product of racially discriminatory intent or purpose." 671 F.2d at 859.

*Smith* also relied on the requirements stated in our prior statistical evidence decision in *Spinkellink v. Wainwright,* 578 F.2d 582, 612–16 (5th Cir.1978). In *Spinkellink,* we said that the proof must establish specific acts evidencing intentional or purposeful discrimination *"against the petitioner"* on the basis of race. *Id.* at 614 n. 40 (quoted in *Smith,* 660 F.2d at 585 (emphasis supplied in *Smith*)). We found the tenders in both *Spinkellink* and *Smith* to be based merely on conclusory assumptions of discrimination and wanting in proof of intentional racial discrimination against those particular petitioners. In both cases, the sentencing discrepancies were explainable on nonracial grounds. However, the dicta in *Smith* suggested that statistical evidence might be adduced which would compel the conclusion that a particular defendant's conviction was the product of intentional racial discrimination. 671 F.2d at 859. It is that dicta that we treat with now.[10]

The following summary of Prejean's detailed description of the tender he sought to make is helpful to understanding its deficiencies. Prejean introduced his Memorandum of Support of Habeas Corpus Relief with the conclusion that his statistical evidence would establish a pattern and practice of discrimination in the imposition of Louisiana's death penalty; that the evidence would distinguish between the number of homicides committed by whites and the number committed by blacks; that it would offer a breakdown of the type of homicide committed (e.g., felony murder, acquaintance murder, etc.); that it would delineate the race of the victim, and that it would present "other salient characteristics of the offense and offender" which may be available. According to Prejean, "after controlling for other factors" this information would indicate that particularly with youthful offenders, the race of the defendant and the race of the victim determines the sentence imposed.

Although Prejean admitted the findings were incomplete, he asserted that the preliminary findings were so stark that it was already clear that further refinement of the data would not change the conclusion he drew that the death penalty in Louisiana is currently being applied in a racially discriminatory manner, particularly when juvenile defendants are involved.

Prejean stated that his statistics had been gleaned from all homicides reported by the State of Louisiana to the F.B.I. from 1976–1980. The statistical breakdown indicated that of 2527 homicides in which the race of the victim was known, 19% of those sentenced to die under the Louisiana statute killed black people, while 81% of those sentenced to death killed whites.

Prejean focused on all homicides statewide in which a black offender was accused of killing a white victim. Only 9% of the Louisiana homicides he included fell into this category; yet, 37% of those sentenced to death under the current Louisiana statute were blacks convicted of killing whites.

---

**10.** The Eleventh Circuit in *Spencer v. Zant,* 715 F.2d 1562 (1983), *vacated for en banc rehearing,* 729 F.2d 1293 (11th Cir.1984), reversed the district court's refusal to grant an evidentiary hearing on a statistical tender. There were three bases for the appellate court's action. The first was that the district court had made a faulty construction of the preclusive effect of state court findings under 28 U.S.C. § 2254(d). Second, the panel reversed the district court's holding that petitioner had committed a "strategic default" in failing to present statistical proof of discriminatory application of the death penalty statute to the state courts. The third ground for reversal was the district court's conclusion that the facial constitutionality of the Georgia death penalty statute would preclude an attack on its constitutionality as applied. The district court opinion was rendered 10 days before *Smith v. Balkcom* was modified as discussed above. The panel concluded that the district court's three legal errors prevented an adequate analysis of the statistical data petitioner sought to present. Because of the markedly different procedural posture of the present case and because the *Spencer v. Zant* panel opinion has been vacated, it is not persuasive on the issues presented here.

From this, Prejean deduced that black offenders who kill white victims have a 200% greater chance of being sentenced to death than white offenders who kill white victims. Furthermore, he observed that no white offenders had been sentenced to death for killing a black victim.

Prejean stated that the disparity was even greater for black youths who murdered a white victim. In such situations, he says black youths have the same chance of receiving a death sentence as do *white adults,* while no white youth has been sentenced to death under the current Louisiana statute.

Prejean stated his tender also would include nationwide statistics to show racial discrimination in sentencing black youths was consistent with the pattern found in Louisiana. Blacks comprise 59% of the currently condemned juveniles in the United States. According to Prejean's tender, since 1864, 40 blacks, as compared to 11 whites, below the age of 18, are reported to have been executed. Finally, Prejean offers to present expert witnesses who will validate these statistical allegations and present more detailed and refined analyses of the information to rebut any inference that nonracial factors may cause these sentencing disparities.

■ Prejean's tender contains a broad spectrum of statistics and figures. He draws not only on the entire State of Louisiana, but also on the nation and even as far back as 1864. The probative value and the relevancy of such far ranging statistics were properly challenged by the district court. The Louisiana Code of Criminal Procedure requires a proportionality review of all first degree murder cases after January 1, 1976 *within the district in which the sentence was imposed.* La.Code Crim.Proc.Ann. art. 905.9.1 § 4(b)(i) (West Supp.1983). Proof of discriminatory application of capital sentencing likewise should be limited to that same district.

■■■ Parishes, and the judicial districts they compose, are individualistic. We take judicial notice that the political and economic make-up, and educational background of citizens vary from one district to the next. Such characteristics identify a parish with certain views, beliefs and practices. That one or more districts might produce juries that persistently discriminate against black defendants in violation of their sworn duty as jurors does not reflect the actions of juries impaneled in another district whose citizens return jury verdicts which cannot be so faulted. If this were not so, proportionality review could not be constitutionally restricted to individual districts. Looking at the statistics compiled for an entire state could improperly disparage convictions rendered fairly and properly by diligent judges and juries. Thus, to test whether discriminatory application of Louisiana's valid capital sentencing statutes has been shown by statistical proof so strong as to permit no other inference than intentional racial discrimination, the statistical base must, at least initially, deal with numbers within the boundaries of the district where the sentence was imposed.

Prejean's tender offered no statistical evidence to suggest that this jury in this district was more inclined to impose the death penalty because he was black and his victim white. As in *Smith v. Balkcom,* the statewide and nationwide data selected for the statistical study cannot justify a leap to the conclusion of discriminatory intent or purpose concerning this jury or this district. As previously indicated in our discussion on proportionality review, *supra* § VI, three first degree murder convictions have been returned since January 1976 in both the district where the offense occurred and the district where the sentence was imposed. None of these resulted in a death sentence. An inference of improper racially discriminatory behavior by the jury cannot be compelled by any amount of expert conjecture.

Regardless of the fact that Prejean has not made a sufficiently compelling showing of racial discrimination by juries in this district, his tender, even looking at statistics for the entire State of Louisiana, falls short of the standard established by the

dicta in *Smith*. Prejean's tender, although more complete than the statistical showings in either *Smith* or *Spinkellink*, and purporting to offer experts that will chink all the cracks, on its face still fails to account sufficiently for nonracial variables.

Assuming Prejean's own claims for his proof are accurate, his statistical evidence still would not establish that this jury in this case intentionally imposed the death penalty on Prejean because of his race and not because of his crime. Despite the string of percentages and statistics suggesting possible racial disparity in capital sentencing of black youths, Prejean has not suggested that the evidence he would submit was sufficiently refined to allow only one inference: that for murders of peace officers engaged in their lawful duties, juries in these two districts of Louisiana recommend death sentences only, or more often, against blacks, young or old, whose victims were white than for non-white victims. Nor does Prejean suggest that his expert possessed any statistics that would yield an inference to rebut the presumption that the jurors in this case—duly sworn to discharge their official duty fairly—recommended death because Prejean's crime of murdering a peace officer was sufficiently reprehensible, not because he was black.

Prejean has not presented any statistics that show, or that even suggest, a white defendant who killed a black or white peace officer while engaged in lawful duties has or would receive a sentence less severe than death. It is this aspect of Prejean's crime—the killing of a peace officer—to which the tendered statistical showing of discriminatory application failed to speak. Without such a showing, Prejean's tender, like those offered in *Smith* and *Spinkellink*, must remain a conclusory general allegation that the death penalty is being administered discriminatorily to punish the killing of white persons by blacks.

We focus on this aspect of Prejean's crime because it is one of nine aggravating circumstances expressly listed by the Louisiana legislature as constituting sufficient reason for a jury to impose the death penalty. The Louisiana Code of Criminal Procedure states that the fact "the victim was a fireman or peace officer engaged in his lawful duties" is to be considered an aggravating circumstance of the crime. Article 905.4(b). When such a crime is committed a jury has little room to act upon its subjective intents. The jury here was not presented with a crime which might or might not fall under the rubric of an offense "committed in an especially heinous, atrocious, or cruel manner." La.Code Crim.Pro. art. 905.4(g). Offenses within this category of aggravating circumstances are subject to an individual's or group's subjective intents and biases, including racial prejudice. Because the killing of a peace officer while engaged in lawful duties involves an objective application of the death sentence, a statistical showing, to meet the compelling standard of *Smith v. Balkcom*, must speak specifically to that circumstance. Prejean's tender does not offer to make such a showing.

■ Prejean's tender told the court no more than that the statistical proof would show among all of those sentenced to die for every type of murder in Louisiana, youthful blacks and blacks who killed white victims made up a disproportionate number. Prejean's self-serving conclusion that his experts will tie together the loose ends of an incomplete analysis simply does not suffice to constitute that compelling indication of discrimination which warrants an evidentiary hearing. The insubstantiality of such a general tender is precisely the sort of statistical tender held inadequate in *Smith v. Balkcom*.

Given the dearth of specific, relevant statistical proof in these districts that any expert would have to work from and the unspecific tender made to show intentional racial discrimination in a peace officer killing of the sort this jury tried, we cannot fault the district court's refusal to conduct an evidentiary hearing in this case.

## VIII. RACIAL DISCRIMINATION IN JURY SELECTION

■ Prejean contends that the federal district court erred in refusing to grant an

evidentiary hearing on the claim that the State systematically excluded blacks from the petit jury. Prejean's sixth and fourteenth amendment claim, if meritorious, would require habeas corpus relief from both the conviction and the sentence. We therefore proceed to consider Prejean's contention. *See generally* La.Code Crim. Pro.Ann. art. 905.1(B); *State v. (Elmo Patrick) Sonnier,* 379 So.2d 1336, 1372 (La. 1979) (on rehearing 1980). *Cf. Vela v. Estelle,* 708 F.2d 954, 966 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 736, 79 L.Ed.2d 194 (1984).

These facts in the trial record are uncontroverted. In the course of the jury selection process, the prosecutor exercised nine peremptory challenges. Four were used to exclude blacks. As a result, Prejean was tried before an all-white jury, with one black alternate juror. Immediately after the twelve white jurors were selected, Prejean moved to quash the panel. The next day the trial court heard arguments on the motion. Defense counsel explained that, due to the change in venue, he was unable to offer direct evidence of systematic exclusion of blacks from petit juries:

> Your Honor, as you know, we're here in Monroe. I do not have the records available to me, of any Lafayette cases that I would have to look at to show what apparently is required by this case, which is systematic exclusion of blacks over a period of time. My only prima facie evidence that I can offer, at this time, is the fact that the District Attorney did preemptorily challenge four (4) black persons—not for cause. All of which were qualified to serve on the jury. The net result is that we now have a twelve (12) person jury, all of which are white.

The trial court denied the motion to quash, and refused to allow Prejean the opportunity to present evidence on the claim at a later date. Following the conviction and death sentence, counsel moved for a new trial but did not urge the juror discrimination argument at that time.

On direct appeal, the Louisiana Supreme Court found that the trial court's denial of the motion to quash was proper. *State v. Prejean,* 379 So.2d at 243–44. In seeking state postconviction relief, Prejean again raised the discrimination claim and proffered evidence that of the two peremptory challenges that the State had exercised in Prejean's Lafayette Parish proceeding (which was subsequently transferred to Ouachita Parish), one had been used to exclude a black individual. The state court determined that this showing was insufficient to entitle the claim to any further consideration, and accordingly denied relief.

In his petition for federal habeas corpus relief, counsel alleged only that in the instant proceedings the prosecutor had deliberately used the peremptory challenges so as to exclude blacks, and that Prejean was prevented from showing the systematic exclusion because the state trial court that convicted him had declined to grant a continuance. In a memorandum in support of his federal habeas corpus petition, Prejean alleged that racial prejudice is a well-known fact of life in Ouachita Parish, where "[o]pen, flagrant, unsophisticated, purposeful discrimination against blacks has been the long time pattern ....", *quoting Ausberry v. City of Monroe,* 456 F.Supp. 460, 463 (W.D.La.1978) *appeal dismissed,* 616 F.2d 565 (5th Cir.1980). Prejean invited the district court to take notice of the "proven racially discriminatory practices of the authorities and citizenry generally within the parish," and to adjust the holding of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), in order to allow a constitutional claim based not upon systematic exclusion, but rather upon the asserted invidious "racial polarization" of the parish. The district court declined so to modify *Swain,* concluding that Prejean's conclusory allegations and vague proffer were insufficient to state a claim for relief. *Prejean v. Blackburn,* 570 F.Supp. at 991.

In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Supreme Court set forth the required components of a valid claim of discrimination in

a state prosecutor's use of peremptory challenges:

> [W]hen the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on an added significance .... in these circumstances ... it would appear that the purpose[s] of the peremptory challenge are being perverted. If the State has not seen fit to leave a single Negro on any jury in a criminal case, the presumption protecting the prosecution may well be overcome.

*Id.* at 223–24, 85 S.Ct. at 837–38 (citations omitted). The Court concluded that, in order to "pose the issue" of invidious racial discrimination in the selection of jurors, "the defendant must show the prosecutor's systematic use of peremptory challenges against Negroes over a period of time." *Id.* at 227, 85 S.Ct. at 839. The burden thus placed on the claimholder is extremely onerous, and has been vigorously criticized.[11] Nonetheless, it remains a necessary hurdle in the course of establishing a valid constitutional claim. *See Willis v. Zant,* 720 F.2d 1212, 1217–21 (11th Cir. 1983); *United States v. McLaurin,* 557 F.2d 1064, 1076–77 (5th Cir.1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978); *United States v. Carlton,* 456 F.2d 207, 208 (5th Cir.1972); *see also Sonnier v. Maggio,* 720 F.2d at 406–07.

▆▆▆ We agree with the district court that the constitutional claim that Prejean sought a hearing to develop is legally insufficient to establish the sort of systematic exclusion of blacks that would entitle him to relief under *Swain.* The simple fact

that the prosecutor exercised his peremptory challenges in the instant case to exclude all blacks from the Ouachita Parish jury panel is inadequate, under *Swain* to pose a constitutional issue. *Swain* also teaches that allegations of historic parish-wide discrimination cannot substitute for the necessity of a particularized showing that the prosecution has engaged in the systematic, invidious use of peremptory challenges. Accordingly, Prejean has failed to state a claim of constitutional significance. *Swain v. Alabama,* 380 U.S. at 222–28, 85 S.Ct. at 836–40; *United States v. Carlton,* 456 F.2d at 207–08. *Cf. Gray v. Lucas,* 710 F.2d 1048, 1061 (5th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 211, 77 L.Ed.2d 1453 (1983) (holding that facts alleged, taken as true, failed to state a claim under the eighth amendment). *But cf. Willis v. Zant,* 720 F.2d at 1217–21 (holding that a Georgia petitioner under a sentence of death had stated a claim under *Swain* such as to entitle him to an evidentiary hearing); *see also* Winick, *Prosecutorial Peremptory Challenge Practices in Capital Cases: An Emperical Study and A Constitutional Analysis,* 81 Mich.L.Rev. 1 (1982) (suggesting that *Swain*'s strict rule be reevaluated in the context of the capital case).

## IX. CONCLUSION

Dalton Prejean's right to due process of law was not violated when the Supreme Court of Louisiana utilized evidence contained in the uniform capital sentence report and in confidential sentence investigation report in the course of affirming the death sentence. Prejean's claims for relief from the sentence of death (1) because of his age at the time of the crime, (2) insufficiency of the Louisiana court's proportionality review, and (3) the failure of the federal habeas corpus court to accord Prejean a hearing on his claims of racial discrimination in jury selection procedures and in the

---

11. *See* authorities cited in *Willis v. Zant,* 720 F.2d at 1120 n. 17. The Supreme Court has expressed a willingness to reassess *Swain* in its modern context. *McCray v. New York,* —— U.S. ——, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983)

(denial of certiorari). A district court has determined that the *Swain* rule is no longer viable. *McCray v. Abrams,* 576 F.Supp. 1244 (E.D.N.Y. 1983).

imposition of the death penalty are without merit. The judgment of the district court is

**AFFIRMED.**

JOHNSON, Circuit Judge, dissenting:

This dissent is occasioned primarily by the majority opinion's failure to fully appreciate Prejean's due process argument and secondly by the majority's conclusion that Prejean's crime was so reprehensible that the sole relevant statistical analysis would be one that shows how race affects the prosecuting and sentencing of persons who kill Louisiana police officers.

At the outset, it is important to correctly characterize this case. Dalton Prejean is black and is a borderline mental retardate. He was convicted by an all white jury. The conviction is for the murder of a white, Louisiana State Trooper. The offense occurred when Prejean was seventeen years of age.

At trial, the Louisiana State trial court correctly suppressed "any and all" of Prejean's prior adjudications of juvenile delinquency. Even so, those very adjudications which occurred during Prejean's juvenile years were specifically and affirmatively utilized by the Louisiana Supreme Court in its opinion affirming Prejean's instant murder conviction.

In the case at bar, Prejean has made an application for a writ of habeas corpus relief to the federal district court. Prejean's fully exhausted petition presented eleven claims of constitutional deprivation. The federal district court has examined these claims, found that each lacked merit and dismissed the application. The federal district court's action was taken without holding an evidentiary hearing.

I. *Appellate Review of the Death Sentence*

The major issue in this appeal may be framed thusly: Does a Louisiana capital defendant have a constitutionally protected right to have the Louisiana Supreme Court review and dispose of his death sentence without expressly relying on intensely prejudicial information that has not been brought within the realm of the penalty jury's consideration? For the reasons set forth below, I believe that Prejean has such a right, and that the violation of this right deprived Prejean of due process of law.

In reviewing Prejean's sentence pursuant to its statutory duty "to determine whether the sentence is excessive," the Louisiana Supreme Court discussed individually the three distinct appellate review criteria of Rule 28, § 1: the "Aggravating Circumstance" (part A), "Passion, Prejudice or Other Arbitrary Factors" (part B), and "Proportionality of the Sentence," (part C). Throughout part "C" of the opinion, the Louisiana Supreme Court very clearly relied on information that can only be found in the confidential sentence investigation report. Perhaps the explicit details of Prejean's adolescent but murderous past, supplied by the confidential sentence investigation report, constitutes the most serious item of prejudicial information that the Louisiana Supreme Court used to facilitate its discussion of the excessiveness *vel non* of Prejean's sentence:

> In June of 1974 Dalton was arrested for the killing of John Doucet, a taxi driver. Dalton admitted the killing and was committed once again to the Louisiana Training Institute. In a later statement about the incident Dalton stated that he and two friends called a cab with the intention of robbing the driver. One of his companions was carrying a gun. The three directed the driver to a quiet part of town and persuaded him to stop while they searched for an address. Dalton insisted on taking the gun from his companion because the other youth appeared to be nervous. Dalton approached the driver, and believing that the driver was reaching for a gun of his own, fired twice and began running. While fleeing he told a passerby to call an ambulance because someone had been shot. Dalton later turned himself in to the police and admitted that he had killed the driver.

\*    \*    \*    \*    \*    \*    .

On December 10, 1976 Dalton Prejean was released to the custody of his aunt in Houston, apparently without any probation requirements. Within seven months Dalton was once more under arrest for killing a human being.

*State v. Prejean,* 379 So.2d at 248. In addition, the court's opinion identified other examples of Prejean's juvenile delinquency and delved into his familial background, employment history, educational level, psychiatric examinations, and borderline mental retardation. Significant portions of the court's discussion find their origin in only one source: the confidential sentence investigation report.

As previously noted, the opinion of the Louisiana Supreme Court is divided into three subheadings that mirror the three-part statutory obligation to determine "excessiveness" by inquiring into the arbitrariness, proportionality, and statutory aggravating circumstances of the sentence. The text of the supreme court's opinion, however, does not fit neatly under the rubrics as styled. The court's "proportionality" review section, part "C", is actually a general discussion of the excessiveness of the sentence; it is virtually indistinguishable from the "arbitrariness" review section, part "B". Throughout parts "B" and "C" the court discusses whether the death sentence is "excessive" because of Prejean's youthful age, his alleged intoxication at the time of the offense, and his borderline mental retardation—three factors that assertedly diminished his capacity to "appreciate the criminality of his conduct." *State v. Prejean,* 379 So.2d at 247. After a short discussion in part "B" of Prejean's youth, his low intelligence, and his voluntary intoxication at the time of the offense, the court concluded:

> Those factors, although significant, are not so numerous and persuasive as to

clearly outweigh the aggravating circumstance of the case, and are discussed in greater detail below [in part "C"].

*Id.* In part "C", after an exhaustive discussion of Prejean's prior criminal conduct and other information ascertainable only from the confidential sentence investigation report, the court determined:

> The record will not support a conclusion that defendant's capacity to appreciate the criminality of his conduct was so impaired because of his mental condition and intoxication that the death sentence was, for that reason, excessive.

*Id.* at 249. Only thereafter did the court conduct its proportionality review of Prejean's sentence—in a footnote to the very last sentence of the majority opinion.

A careful reading of the opinion thus reveals that the court's discussion of Prejean's impaired capacity to commit the crime actually straddles parts "B" and "C", and relies heavily upon the nonrecord prejudicial information contained in the confidential sentence investigation report. It is abundantly clear, therefore, that the Louisiana Supreme Court relied, in some significant part, on the confidential prejudicial information in discharging its statutory duty to determine the excessiveness—including arbitrariness and disproportionality—of the jury's verdict.

### A. The Merits

In rejecting Prejean's due process argument, the federal district court observed that "[i]n Louisiana, as in Florida, the Supreme Court only reviews sentences; it does not impose the sentence." *Prejean v. Blackburn,* 570 F.Supp. 985, 997 n. 16 (W.D.La.1983). From this observation the court established the premise that "[m]aterial outside of the record can have no effect in the imposition of the sentence." [1] *Id.* at 997. This premise is

---

**1.** In support of this statement, the court cited *Brown v. Wainwright,* 392 So.2d 1327 (Fla. 1981), *cert. denied,* 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981), and *Ford v. Strickland,* 676 F.2d 434 (11th Cir.1982). *Brown,* a Florida case, was erroneously designated as a Louisiana case. *Ford,* an Eleventh Circuit case, was erro-

neously referred to as a Fifth Circuit case. Furthermore, the panel opinion in *Ford* had been superseded by the court's en banc opinion. *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983) (en banc) *cert. denied,* ―― U.S. ――, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983). Because the plurality en banc opinion determined that the Florida

flawed because it ignores two aspects of the Louisiana death sentencing scheme that distinguish this and any Louisiana capital case from any noncapital case in which presentence reports receive judicial consideration, and from any death penalty case arising out of a capital sentencing system that does not depend upon structured, systematic appellate review in order to assure its constitutionality.

First, the Louisiana capital sentencing scheme does not vest the trial judge with the power to disturb the jury's sentence of death. Unlike the capital sentencing procedures employed in Florida, *see Proffitt v. Florida*, 428 U.S. 242, 248–50, 96 S.Ct. 2960, 2964–65, 49 L.Ed.2d 913 (1976), or in California, *see Pulley v. Harris*, — U.S. ——, 104 S.Ct. 871, 880–81, 79 L.Ed.2d 29 (1984), the Louisiana procedure binds the presiding judge to accept the jury's verdict of death. La.Code Crim.Pro.Ann. art. 905.8 (Supp.1982). Accordingly, once the jury verdict of death is rendered, the trial judge assumes a role analogous to that of a conduit, passing the verdict, and thus the sentence of death, to the Louisiana Supreme Court for its review. The state supreme court thereafter performs its mandatory review of the aggravating circumstance and its concurrent assessment of the arbitrariness of the verdict and the proportionality of the sentence.

It is precisely on account of the trial judge's limited sentencing role that the first factor distinguishing the Louisiana scheme becomes readily apparent. In the absence of any trial-level regulation over the jury's verdict once rendered, the entire burden of ensuring that the jury has adhered to its constitutional duty shifts to the appellate level. For Louisiana fully to discharge its responsibilities at the "selection stage," *see Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983), it must afford its capital defendant "meaningful appellate review" of the death sentence.[2] Since no sentence may constitutionally be imposed in Louisiana without meaningful appellate review, the state supreme court of Louisiana does not simply perform the duties of a reviewing court. The "selection" of the criminal defendant is essential to the imposition of his sentence; "selection" necessarily entails some input from the state supreme court; and so it is logical to conclude that the Louisiana Supreme Court must necessarily perform the undifferentiated functions of both a sentence-reviewing court and, to a significant extent, a sentence-imposing court.[3] Accordingly, the district court's assertion that the Louisiana Supreme Court merely "reviews" a capital sentence, but does not "impose" it, is inevitably specious. Most importantly, however, it is an oversimplification of deep constitutional dimension.

Second, a *post*sentence report in a Louisiana death penalty case serves a vastly different function from that of the typical presentence report. Once adjudged guilty, the typical [noncapital] defendant is sentenced pursuant to the sentencing authority's broad discretion to impose sentence within the legislatively determined statutory limits. To carry out this obligation, a sentencing judge may consider the unverified hearsay information contained in a presentence investigation report[4] in order to

---

Supreme Court did not consider nonrecord information in its appellate review, that case is largely inapposite. *See id.* at 809–11.

**2.** "The Georgia scheme provides for categorical narrowing at the definition stage, and for individualized determination and appellate review at the selection stage." *Zant v. Stephens*, 103 S.Ct. at 2744.

**3.** For the sake of analytical clarity, the Louisiana Supreme Court might be viewed as "imposing" sentence in a fashion analogous to that by which a trial judge may impose sentence under

the California or Florida capital sentencing procedures.

**4.** A trial judge should not view the information contained in a defendant's presentence report until after the defendant has been adjudged guilty. "To permit the *ex parte* introduction of this sort of material to the judge who will pronounce the defendant's guilt or innocence or who will preside over a jury trial would seriously contravene the rule's purpose of preventing possible prejudice from premature submission of the presentence report." *Gregg v. United States*, 394 U.S. at 492, 89 S.Ct. at 1136–37 (discussing Fed.R.Crim.P. 32).

give the defendant a "sentence suited to his particular character and potential for rehabilitation." *Gregg v. United States,* 394 U.S. 489, 492, 89 S.Ct. 1134, 1137, 22 L.Ed.2d 442 (1969) (discussing Fed.R. Crim.P. 32); *see Townsend v. Burke,* 334 U.S. 736, 740–41, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948). In a Louisiana capital sentence case, however, the jury, acting in its capacity as a vital link to the conscience of its community, has set the sentence of death as the maximum punishment for the proven conviction. Since the jury has already located the assertedly proper punishment at the statutory maximum, the State has little, if any, reason to obtain nonrecord information tending to bolster the jury's decision.[5] The State does have a compelling interest to consider, if it should so desire, postsentence information that might belie the jury's harsh pronouncement and justify a less severe sentence. Under these circumstances the postsentence reports may certainly affect the appellate court's ultimate decision whether to affirm or to reverse the jury's solemn directive, and the State therefore has a legitimate interest in procuring the reports. But whatever may be the ultimate function of the reports, the defendant's interest in their reliability plainly outweighs the State's interest in their use. *See Gardner v. Florida,* 430 U.S. 349, 359–360, 97 S.Ct. 1197, 1205–1206, 51 L.Ed.2d 393 (1977). And the Louisiana capital defendant's interest is greatly magnified by the fact that he is entitled under the constitution to "meaningful appellate review" as a precondition to his irreversible selection for capital punishment. Accordingly, the district court's analysis of the nonrecord evidence claim is not persuasive.

### *Presnell & Gardner*

Prejean's due process argument is an extrapolation from two fairly recent Supreme Court cases: *Presnell v. Georgia,* 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978) and *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Although neither case by itself establishes a holding dispositive of Prejean's claim, together the cases supply a valuable insight into our constitutional jurisprudence. The insight guides our identification and application of a rational rule of law which comports with and upholds our obligation "to re-examine capital sentencing procedures against evolving standards of procedural fairness in a civilized society." *Gardner v. Florida,* 430 U.S. at 357, 97 S.Ct. at 1204 (footnote omitted). This obligation, while not unrelated, is separate from our eighth amendment duty to ensure that a state capital sentencing procedure affords an acceptable level of "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina,* 428 U.S. 280, 304–05, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976) (footnote omitted) (plurality opinion).[6]

In *Gardner v. Florida,* the United States Supreme Court considered the question whether a Florida defendant was denied due process of law when a death sentence was imposed on the basis of information contained in a presentence investigation report, a portion of which had not been made available to the defendant. 430 U.S. at 357–62, 97 S.Ct. at 1204–07. A jury had convicted Gardner of murder, and in a separate sentencing hearing had recommended life imprisonment. Thereafter the trial judge ordered a presentence investigation report and disclosed all but a "confidential" portion to the parties. After considering the information in the report, the trial judge sentenced Gardner to death. On ap-

---

5. "[T]he extinction of all possibility of rehabilitation is one of the aspects of the death sentence that makes it different in kind from any other sentence...." *Gardner v. Florida,* 430 U.S. 349, 360, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977).

6. As the Supreme Court has noted, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, *and appear to be,* based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. at 358, 97 S.Ct. at 1204 (emphasis added). Thus a state capital sentencing scheme is limited by the eighth amendment duty and circumscribed by a separate, yet related, duty to administer its process in a manner that assures a vigilant and faithful adherence to constitutional due process.

peal, the Florida Supreme Court affirmed the death sentence. The appellate record did not include the confidential portion of the report. The court nonetheless rejected Gardner's argument that the trial judge had erred in basing his decision in part on the sentencing report. *Id.* at 351–54, 97 S.Ct. at 1201–03.

On certiorari, the United States Supreme Court vacated the death sentence. The Court began its discussion by noting that it would be unnecessary to consider the contents of the confidential report, which the state had disclosed in an appendix to its brief.[7] The Court stressed that a death sentence is fundamentally different from any other kind of legitimate punishment, and acknowledged that the protection of the due process clause extends to the sentencing process. "The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process." *Id.* at 358, 97 S.Ct. at 1205; *cf. Hicks v. Oklahoma*, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980). The Court then turned to the question of the reliability of confidential presentence reports:

> [C]onsideration must be given to the quality, as well as the quantity, of the information on which the sentencing judge may rely. Assurances of secrecy are conducive to the transmission of confidences which may bear no closer relation to fact than the average rumor or item of gossip, and may imply a pledge not to attempt independent verification of the information received. The risk that some of the information accepted in confidence may be erroneous, or may be misinterpreted, by the investigator or by the sentencing judge, is manifest.

If, as the State argues, it is important to use such information in the sentencing process, we must assume that in some cases it will be decisive in the judge's choice between a life sentence and a death sentence. If it tends to tip the scales in favor of life, presumably the information would be favorable and there would be no reason why it should not be disclosed. On the other hand, if it is the basis for a death sentence, the interest in reliability plainly outweighs the State's interest in preserving the availability of comparable information in other cases.

*Id.* 430 U.S. at 359, 97 S.Ct. at 1205. Perhaps most relevant to the instant case, the Court explained that the presentence report must be disclosed to the reviewing state court in order to ensure the evenhanded administration of capital sentencing decisions.[8] That counsel had not requested access to the full report in no way justified "the submission of a less complete record to the reviewing court than the record on which the trial judge based his decision to sentence petitioner to death." *Id.* at 361, 97 S.Ct. at 1206.

In *Presnell v. Georgia*, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207, the Supreme Court had further occasion to consider the extent to which due process protection permeates a criminal defendant's appeal of his capital sentence. In *Presnell*, the Court took up the issue whether a defendant could be condemned to die on the basis of an appellate court's finding that the record contained evidence establishing an aggravating circumstance. A jury had found Presnell guilty of murder. In the sentencing phase of the trial, the judge instructed the jury that it could impose the death sentence if it determined that Presnell had committed the murder while engaged in the offense of "kidnapping with bodily harm,

---

7. The court stated:
   It is not a function of the Court to evaluate in the first instance the possibly prejudicial impact of facts and opinions appearing in a presentence report.
   *Gardner v. Florida*, 430 U.S. at 354 n. 5, 97 S.Ct. at 1203 n. 5.

8. "Without full disclosure of the basis for the death sentence, the Florida capital-sentencing procedure would be subject to the defects which resulted in the holding of unconstitutionality in *Furman v. Georgia*." *Gardner v. Florida*, 430 U.S. at 361, 97 S.Ct. at 1206.

aggravated sodomy." *Id.* at 14–15, 99 S.Ct. at 236. The jury returned a sentence of death.[9] On appeal, the Supreme Court of Georgia ruled that the offense of sodomy would not properly constitute an aggravating circumstance. Nonetheless the court affirmed the sentence, holding that even though there was no jury finding on the issue of forcible rape, evidence in the record sufficiently established that offense and therefore supported the necessary aggravating circumstance.

On certiorari, the United States Supreme Court reversed. First, relying on *Cole v. Arkansas*, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948), the Court recognized that a criminal defendant's right to due process is violated when his conviction is affirmed on the basis of evidence establishing an offense on which the jury had not been instructed:

> It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made.... To conform to due process of law, petitioners were entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court.

*Presnell v. Georgia*, 439 U.S. at 16, 99 S.Ct. at 236, *quoting Cole v. Arkansas*, 333 U.S. at 201, 202, 68 S.Ct. at 517. Second, relying on *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393, the Court concluded that the "fundamental principles of procedural fairness" enunciated in *Cole*[10] "apply with no less force at the penalty phase of a trial in a capital

case...." Because in upholding the death sentence the state appellate court relied on evidence that was not properly the subject of the jury's finding, the Court reversed the death sentence.

### The Due Process Violation

It is submitted that *Gardner* and *Presnell*, when applied in the context of the Louisiana capital sentence system, establish Prejean's due process right to have the validity of the jury's sentencing decision appraised on the basis of the evidence that was brought before the jury, unaffected by the use of extremely prejudicial extraneous information that was never incorporated into the adversarial process. As has been noted, under Louisiana's capital sentencing process, which entitles a capital defendant to "meaningful appellate review," the Louisiana Supreme Court sits in a sentence-reviewing capacity as well as in a capacity analogous to that of a sentence-imposing entity. *See* note 3, *supra*, and accompanying text. By using the nonrecord information in this instance, the Louisiana Supreme Court injected extraneous and untested information into the "selection phase" of the sentencing process. *See Zant v. Stephens*, 103 S.Ct. at 2741–44. That the jury was no longer involved in the selection decision only rendered more acute Prejean's interest in the reliability of the postsentence report. For however strictly the state supreme court in fact may have assessed the jury's "individualized determination" of Prejean's character and the circumstances of his crime, it did so regardful of prejudicial information both more potent and more extensive than that which the jury considered.

---

9. Actually, the jury had convicted Presnell of three capital offenses, and in the penalty phase had returned a verdict sentencing Presnell to three death sentences. Two of the capital offenses and sentences depended on Presnell having committed "forcible rape." The jury's verdict simply found "rape." Since the jury had been instructed on both forcible and statutory rape, the Georgia Supreme Court was unwilling to assume that the jury's verdict referred to the more serious offense. Accordingly, the court reversed the two death sentences that depended

on forcible rape. *Presnell v. Georgia*, 439 U.S. at 15 & n. 1, 99 S.Ct. at 236 & n. 1.

10. *Presnell* necessarily expanded *Cole*. The jury in *Presnell* had been instructed on forcible rape as well as statutory rape. The evidence supporting the aggravating circumstance therefore may have been the subject of the jury's finding, but if so the finding was so ambiguous that it was not properly attributable to the offense of forcible rape. *See* note 9, *supra*.

In adulterating its constitutionally required "review" function by openly recognizing unreliable and untested information, the court introduced potential for error inimical to the *Furman v. Georgia* directive that capital sentencing systems be free of intolerably arbitrary factors. 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *see Gregg v. Georgia,* 428 U.S. 153 at 188–90, 195, 96 S.Ct. 2909 at 2932–33, 2935 (1976). In expressly utilizing the confidential, untested information in the midst of its dual, undifferentiated functions to "impose" and to "review" the sentence, the court clearly ran afoul of the requirement that a criminal defendant be sent to his death only by dint of material information forged by the adversarial process, *see Gardner,*[11] and tempered in the crucible of public awareness, *see Presnell; Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.

Accordingly, the Louisiana Supreme Court's use of prejudicial postsentence information in this case infringed Prejean's right to have the jury's verdict assessed on the basis of the criteria that circumscribed the jury's deliberation, and simultaneously denegrated the appellate court's constitutional obligation to determine whether the jury has acted arbitrarily or has rendered an otherwise excessive sentence.

This analysis, of course, in no way depends on a finding that counsel was not furnished the confidential sentence investigation report. While Prejean's counsel may have been alerted to the contents of the confidential sentence investigation report, notice alone falls short of satisfying the Louisiana defendant's right to have the appellate review of his death sentence fairly and objectively administered.[12] Mani-

---

**11.** "[D]ebate between adversaries is often essential to the truth seeking function of trials ...." *Gardner v. Florida,* 430 U.S. at 360, 97 S.Ct. at 1206.

**12.** Prejean's counsel successfully obtained the exclusion of Prejean's juvenile record from the guilt and sentencing phases of trial. Once the trial was completed and the reports were made, Prejean certainly had a statutory right to object to the information contained in both the UCSR and the confidential sentence investigation report. His objections were directed solely at the UCSR. Although the Louisiana trial judge is vested with the discretion to hold a "contradictory hearing," the judge did not find it necessary to order any such hearing. *See* La.S.Ct. Rule 28, § 3(c). The utility of a contradictory hearing under these circumstances is doubtful: the trial judge and Louisiana Supreme Court were well aware of Prejean's juvenile/criminal background, and Prejean has admitted that the reports accurately display his prior juvenile adjudications. The crucial factor here is that Prejean is objecting to the Louisiana Supreme Court's express *use* of the postsentence reports in a manner that helps justify the severity of his sentence. He does not contend that the factual details contained in the reports may not enter the cognizance of the members of the Louisiana Supreme Court.

In this case the Rule demonstrably worked to Prejean's disadvantage. Prejean's counsel elected, as a tactical decision, not to put Prejean on the stand to testify in his own behalf at the sentencing hearing. Had Prejean and others (such as juvenile correction officials, the psychiatrists who had evaluated him during his troubled youth, and immediate family members)

testified during the sentencing phase of the trial, then there would have been nothing in the postsentence reports that was not already disclosed to the jury. Having prevailed in a motion to suppress the evidence, and having decided as a matter of trial strategy not to attempt a more exhaustive elucidation of Prejean's pitiable character, counsel nonetheless encountered the Louisiana Supreme Court's *use* of the objectionable information at a point in time when his interest in reliability had become paramount, *see Gardner v. Florida,* 430 U.S. at 359, 97 S.Ct. at 1205, and yet when his ability to demonstrate fallacy had become rather limited. *See also id.* at 354 n. 5, 360–61, 97 S.Ct. at 1203 n. 5, 1205–06.

On a purely visceral level, the information contained in the two postsentence reports was profoundly prejudicial. The State's pursuit of the death sentence against Prejean rested on one factor, and one factor alone: that the murder victim was a peace officer engaged in his lawful duties. The factors militating in favor of a sentence less than death were, on the contrary, numerous: Prejean was only 17 at the time of the offense; he functioned at the mental age of 13½ (borderline mental retardation); and his capacity to appreciate the criminality of his conduct was diminished by his night of drinking. Had the Louisiana Supreme Court disregarded the two postsentence reports, and devoted serious consideration to these mitigating factors (perhaps even in the light of the racial composition of the jury and the respective races of the victim and offender), a reversal of the sentence might very well have been forthcoming. *See, e.g., State v. (Eddie) Sonnier,* 380 So.2d 1, 6–9 (La.1979); *cf. Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175

festly, the Due Process Clause demands that a Louisiana defendant's eighth amendment right to meaningful appellate review remain unadulterated by the use of damaging extraneous information in the review process. Accordingly, the Louisiana Supreme Court's express use of the confidential information in its review of the excessiveness of the sentence violated the due process right adumbrated by *Presnell* and *Gardner.*

Due process is a flexible concept; it "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The typical inquiry into the scope of due process rights requires a balancing of competing interests. *See generally Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 872–74, 74 L.Ed.2d 675 (1983); *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). When the interest at stake is human life, however, the due process analysis focuses sharply on the fairness of the procedures employed to deprive a prisoner of that interest. *See, e.g., Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 874–77, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Gardner v. Florida,* 430 U.S. at 355–62, 97 S.Ct. at 1203–07; *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The inquiry accordingly centers on the fairness of the Louisiana Supreme Court's use of the two prejudicial postsentence reports in affirming the death sentence. This analysis implicitly entails a balancing of the private benefit to Prejean against the public burden incurred by the State. Prejean would derive substantial benefit from the Louisiana Supreme Court's meaningful appellate review of his sentence based only upon the information known to the jury.

On the other hand the Louisiana Supreme Court, as an organ of the State, plainly has a legitimate interest in learning all that it may choose to learn about the capital defendant whom it may pass unto death. These competing interests have clashed in the instant case, but they may be readily reconciled.

Along with the reasonable, perhaps laudable, goal of understanding the background histories of the individuals who have been selected for the ultimate punishment, the Louisiana Supreme Court must carry out its constitutional obligation to examine the jury's solemn decision. By allowing its review of the arbitrariness and excessiveness of the sentence to be prominently influenced by severely harmful information that could not have been a factor in the jury's decision, the Louisiana Supreme Court permitted an element of intolerable unfairness to be injected into the proceedings. The error is particularly acute in the context of Louisiana's capital sentencing system, because the Louisiana Supreme Court operates as a sentence-reviewing body and simultaneously operates in a manner akin to a sentence-imposing body. Under the particular circumstances present here, the Louisiana Supreme Court encountered an obligation to separate its examination of the information upon which the jury actually deliberated from its use of whatever prejudicial information it may have chosen to discover. In this case, however, the Louisiana Supreme Court openly commingled those separate functions; its opinion publicly demonstrates that error. Prejean was entitled to such process as would ensure the meaningful appellate review of his sentence, unimpugned by the use of extremely prejudicial information contained in the postsentence reports.

(1980) (valid liberty interest in sentencing discretion). Additionally, in reviewing the "arbitrariness" of the jury's conduct the Louisiana Supreme Court might have found it significant that the jury, without any knowledge of Prejean's past juvenile record, returned the most severe sentence permitted in our civilized society. Instead, however, the supreme court focused on prejudicial information that could not possibly have been known by the jury in its exercise of its sentencing discretion. As a result whatever moral reservations the State and its judiciary otherwise might have encountered in sending such a youthful offender to his death were immediately assuaged, and the sentence objectively became more readily justifiable.

The circumstances of this capital case bear reiteration. An all white jury sentenced Dalton Prejean, age 17 and black, to death by electrocution. It did so without any knowledge whatsoever of his long history of serious juvenile delinquency, a history of illicit conduct that belied his youthful age. From the very fact of the jury's verdict, the public may presume that the jury believed that the circumstance in aggravation—the killing of a (caucasian) state trooper—outweighed testimony establishing Prejean's youthful age, his deficient intellect, and the extent to which he was under the influence of alcohol at the time of the offense. Yet the Louisiana Supreme Court, unlike the jury, found Prejean's youth to be a significant factor, at least to the extent that his youthful years had been inured to incorrigibility and violence. In conducting the constitutionally sacred appellate review of Prejean's sentence, the supreme court utilized evidence of Prejean's adolescent criminal past, suppressed from the jury's knowledge, to justify, at least in part, the ultimate penalty.

The court's use of the two reports has not been urged as having violated the eighth amendment, either by causing an arbitrary sentence or by rendering the appellate review constitutionally meaningless. It has not been asserted, nor is it suggested, that Louisiana Supreme Court Rule 28 is unconstitutional as written. On the contrary, the legal rights involved in this case guard the fair conduct of facially proper provisions of state law. In any capital case, the UCSR and the confidential sentence investigation report may be received by the Louisiana Supreme Court without raising the spectre of a due process violation. Indeed, the prejudicial information in the two types of report regularly may enter the percipience of each Louisiana Supreme Court Justice without giving cause for constitutional alarm. But the court may not, as here, put extremely prejudicial postsentence information to use in the sentence review portion of the opinion; this information, unknown to the jurors, cannot be used by the court to justify even slightly the jury's verdict. For this Court to hold otherwise countenances potential for gross unfairness in the delicate calculus of the death sentence decision-making process.

For the above reasons, Dalton Prejean should be granted the Writ on his due process claim.

## II. Discrimination in Capital Sentencing

The majority opinion holds that none of Prejean's five claims for relief establish a violation of his constitutional rights. I cannot agree that Prejean is not, at the least, entitled to an evidentiary hearing on his racial discrimination-in-capital-sentencing claim. The majority conveniently concludes that killing a police officer is so utterly reprehensible that only a statistical study of murders of law enforcement officers would be relevant (Prejean was, and perhaps still is, the only person in the state on death row for murdering a peace officer). While it is true that Prejean's statistical proof would have to cure the defects that this Court noted in *Smith v. Balkcom*, 671 F.2d 858 (5th Cir.1982), it is errant to suggest that, in this case, only a study of the murders of Louisiana peace officers could enable a judicial finding of racial discrimination. It is essential to keep in mind that Prejean's claim stems from both the eighth and fourteenth amendments, and that the spectre of arbitrary or invidious jury conduct is raised by a showing that Louisiana juries, however racially constituted, *sentence* black murderers to death substantially more frequently than white murderers, or that they sentence to death any murderers much more frequently for killing whites than for killing blacks. If the proffered statistical study would establish these disparities, it would by necessity be focused strictly upon those murder prosecutions which had already resulted in convictions and in which the jury was being asked to find at least one statutory aggravating circumstance. So long as the proffered statistical data would analyze the racial impact of those sentencing phases in which the state · adduced evidence of at least one of the nine statutory aggravating

circumstances, it would be highly relevant on the issue of the jury's discriminatory, and therefore arbitrary, conduct.

In light of Louisiana's legislative (and constitutional) determination that *nine* separate aggravating circumstances are so reprehensible that each *alone* enables the execution of a convicted murderer, it cannot be suggested that Louisiana society has any basis for claiming a superior aversion to any one factor *vis a vis* the others. In any event, that cannot (and should not) be this Court's conclusion, as it is a wholly unsubstantiated foray into the realm of simple conjecture. I believe that the proffered evidence entitled Prejean to an evidentiary hearing. *See Townsend v. Sain*, 372 U.S. 293, 312–313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963); *Spencer v. Zant*, 715 F.2d 1562, 1579–1582 (11th Cir.1983).

For the foregoing reasons, I respectfully dissent.