**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Eugene LESLIE, Defendant-Appellant.**

No. 83–3719.

United States Court of Appeals, Fifth Circuit.

April 10, 1985.

Rehearing En Banc Granted May 14, 1985.

Garwood, J., plans to file dissenting opinion at later date.

Robert Glass, New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., Howat A. Peters, Jr., Harry W. McSherry, Jr., Fred P. Harper, Jr., Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before BROWN, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Eugene Leslie challenges his drug conviction on three grounds: the prosecutor improperly used all of his peremptory challenges against black veniremen, the plea agreement letters between the government and various government witnesses were incomplete and improperly vouched for the credibility of those witnesses, and Leslie was denied the opportunity to impeach the testimony of a government witness. We find merit in Leslie's first claim, and we reverse and remand on that claim. In all other respects, we affirm.

I.

Leslie, a black man, was indicted, tried, and found guilty of conspiring to distribute narcotics in violation of 21 U.S.C. § 846 (1982), and of possessing narcotics with the intent to distribute them in violation of 21 U.S.C. § 841(a)(1) (1982). After the voir dire and after the district court excused veniremen for cause, the United States Attorney exercised each of his six peremptory challenges permitted by Fed.R.Crim.P. 24(b) against black veniremen. These six black veniremen were the only blacks on Leslie's jury panel of thirty-six. The prosecutor also used his sole peremptory challenge permitted by Fed.R.Crim.P. 24(c) to excuse the only black person on the panel of alternates. Immediately after both parties exercised their peremptory challenges, Leslie moved for a mistrial and argued that the pattern in which the prosecutor employed his peremptories demonstrated that the prosecutor's conduct was racially motivated. Leslie urged the district court to invoke its discretionary authority over the conduct of the trial to grant his motion.

The prosecutor stated that he did not exercise his peremptory challenges for racial reasons, and he offered to explain, in camera, his reasons for striking the black veniremen. The district court denied Leslie's motion for a mistrial, stating that a prosecutor need not offer any explanation for the manner in which he exercises his peremptory challenges. As a result, Leslie was tried before and convicted by an all-white jury.

Leslie was indicted with at least six other people: Fernando Giron, Thomas Gray, Claude Griffin (Griffin), and Griffin's wife, son, and daughter. Gray and Griffin pled guilty and agreed to testify for the government in the case against Leslie and Giron, who were tried together. In connection with their plea arrangements with the government, Gray and Griffin executed standard plea agreement letters that the government provided. These plea agreement letters were admitted into evidence over Leslie's objection.

Consistent with their plea agreements, Gray and Griffin testified against Leslie and Giron at the trial. On the second day of the trial, after Gray, Griffin, and others had given devastating testimony against Giron, Giron agreed to plead guilty. The case against Leslie proceeded. The day after Giron had agreed to plead guilty, the government called Giron to testify against Leslie. In his direct testimony, Giron indicated that he occasionally had delivered cocaine to and had received payments from Leslie. In Leslie's vigorous cross-examination, Leslie sought to establish that Giron was biased against Leslie and had agreed to plead guilty and testify against Leslie only to curry favor with the prosecutor and the sentencing judge. Specifically, Leslie sought to have Giron concede that the government would not accept Giron's guilty plea unless Giron agreed to testify against Leslie. Giron made no such concession and testified that at the time the agreement was consummated he did not know he would be called as a government witness in Leslie's case.

Leslie then sought to impeach Giron's testimony by calling Giron's attorney, James Moriarty, as a witness. The court conducted a hearing outside the jury's presence and asked Moriarty a series of questions concerning the plea agreement. Moriarty testified that the two critical aspects of the plea agreement were that Giron would testify in the case against Leslie and that Giron would plead guilty to one count of his two-count indictment. He also testified that he had specifically asked Giron: "Are you [Giron] willing to testify in this case against Leslie?" and that Giron's response was "Yes." Finally, Moriarty testified that he believed his client understood all aspects of the plea agreement. The district court did not allow Leslie to call Moriarty as a witness at trial, in part, because it did not find Giron's and Moriarty's testimony to be in substantial conflict.

In this appeal Leslie raises three claims. Initially, he argues that we should invoke our supervisory authority to ensure that federal prosecutors do not employ peremptory challenges to strike only black veniremen. Second, he claims that the district court improperly admitted the plea agreement letters into evidence because the letters were both under- and over-inclusive and because they improperly bolstered the credibility of the government witnesses. Third, he asserts that the district court erroneously denied him the opportunity to impeach Giron's testimony and demonstrate Giron's bias by calling Moriarity as a witness. We address each contention in turn.

## II.

### 1. THE SUPERVISORY POWER CLAIM

Racial discrimination in the selection of grand and petit jurors is a disturbingly familiar and recurring problem in our criminal justice system. The Supreme Court has stated that the systematic exclusion of persons based upon the persons' race from the grand jury pool, the petit jury pool, or the petit jury through the prosecutor's use of peremptory challenges violates a defendant's equal protection rights guaranteed by the Fourteenth Amendment. *See Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (petit jury—peremptory challenges); *Strauder v. West Virginia*, 100 U.S. 303, 10 Otto 303, 25 L.Ed. 664 (1880) (grand and petit jury pools). In this case, Leslie concedes that he cannot satisfy the literal requirements of *Swain* by demonstrating that federal prosecutors in New Orleans systematically employed peremptory challenges to exclude blacks from petit juries in multiple cases over a period of time. He nevertheless argues that since this case, unlike *Swain*, involves a federal prosecution, this Court should use its supervisory authority over federal district courts and federal prosecutors to correct practices compromising the integrity of the judicial process and prevent prosecutors from striking veniremen solely because of the veniremen's race. He argues that the exclusion of blacks from the petit jury in his case undermines public confidence in the judicial system, impinges upon judicial integrity, and is manifestly unfair.

### A. *The Supreme Court's Exercise of Its Supervisory Power*

The so-called supervisory power doctrine was articulated formally over four decades ago in *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943),[1] and has been interpreted to. permit federal courts[2] to formulate procedural rules not

---

**1.** Recent cases have indicated that the doctrine existed long before *McNabb* was announced. *See Rosales-Lopez v. United States*, 451 U.S. 182, 192, 101 S.Ct. 1629, 1636, 68 L.Ed.2d 22 (1981) (describing *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931), as resting upon supervisory power grounds); *Ristaino v. Ross*, 424 U.S. 589, 598 n. 10, 96 S.Ct. 1017, 1022 n. 10, 47 L.Ed.2d 258 (1976) (same).

**2.** In *McNabb*, the Supreme Court referred to its supervisory authority but did not indicate whether similar authority existed in the lower federal courts. 318 U.S. at 340. Subsequent Supreme Court cases, however, removed any doubt that the lower federal courts possess supervisory authority concomitant with that possessed by the Court. *See United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983) ("[I]n the exercise of supervi-

specifically required by the Constitution or federal statutes. *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983). *McNabb* involved a prosecution for the murder of a federal agent. A failure by the arresting officers to follow proper detention and interrogation procedures led the Court to reverse the convictions. The Supreme Court rested its decision upon its supervisory power over the lower federal courts. Initially, the Court recognized that:

> while the power of [the] Court to undo convictions in state courts is limited to the enforcement of those "fundamental principles of liberty and justice" ... which are secured by the Fourteenth Amendment, the scope of [the Court's] reviewing power over convictions brought ... from the federal courts is not confined to ascertainment of Constitutional validity.

*Id.* 318 U.S. at 340, 63 S.Ct. at 642.[3] "Judicial supervision of the administration of criminal justice in the federal courts", the Court reasoned, "implies the duty of establishing and maintaining civilized standards of procedure and evidence. Such standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reason which are summarized as 'due process of law' and below which we reach what is really trial by force." *Id.* In reversing the defendant's convictions, the Court announced the duty of courts "as agencies of justice and custodians of liberty" to preserve the integrity of the judicial process and guard against practices employed in cases such as *McNabb. Id.* at 347, 63 S.Ct. at 616.

Subsequent to *McNabb,* the Supreme Court has repeatedly exercised its supervisory power over lower federal courts in a wide variety of cases to reverse a conviction which was supported by false evidence, *Mesarosh v. United States,* 352 U.S. 1, 14, 77 S.Ct. 1, 8, 1 L.Ed.2d 1 (1956); *Communist Party of the United States v. Subversive Activities Control Board,* 351 U.S. 115, 125, 76 S.Ct. 663, 668, 100 L.Ed. 1003 (1956), to curtail improper practices by federal attorneys, *United States v. Hale,* 422 U.S. 171, 180 & n. 7, 95 S.Ct. 2133, 2138 & n. 7, 45 L.Ed.2d 99 (1975); *Grunewald v. United States,* 353 U.S. 391, 422 & 424, 77 S.Ct. 963, 983 & 984, 1 L.Ed.2d 931 (1957); *Jencks v. United States,* 353 U.S. 657, 668 & 672, 77 S.Ct. 1007, 1013 & 1015, 1 L.Ed.2d 1103 (1957); *Roviaro v. United States,* 353 U.S. 53, 60, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957), to suppress evidence government agents gained through misconduct, *Mallory v. United States,* 354 U.S. 449, 453 & 455, 77 S.Ct. 1356, 1358 & 1359, 1 L.Ed.2d 1479 (1957); *Rea v. United States,* 350 U.S. 214, 217, 76 S.Ct. 292, 294, 100 L.Ed. 233 (1956); *Upshaw v. United States,* 335 U.S. 410, 412 & 414 n. 2, 69 S.Ct. 170, 171 & 172 n. 2, 93 L.Ed. 100 (1948), to preserve a criminal contemner's right to a jury trial, *Cheff v. Schnackenberg,* 384 U.S. 373, 380, 86 S.Ct. 1523, 1526, 16 L.Ed.2d 629 (1966), or to protect the defendant from an overzealous district

---

sory powers, federal courts may ... formulate procedural rules not specifically required by the Constitution or the Congress."); *United States v. Payner,* 447 U.S. 727, 735 & n. 7, 100 S.Ct. 2439, 2446 & n. 7, 65 L.Ed.2d 468 (1980) (referring to the use of supervisory power by the "federal courts"); *Donnelly v. DeChristoforo,* 416 U.S. 637, 648 n. 23, 94 S.Ct. 1868, 1874 n. 23, 40 L.Ed.2d 431 (1974) (federal appellate courts may redress prosecutorial misconduct through the proper exercise of their supervisory power); *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (federal "appellate courts" may exercise supervisory authority over district courts to cure errors not amounting to constitutional violations); *Bartone v. United States,* 375 U.S. 52, 54, 84 S.Ct. 21, 22, 11 L.Ed.2d 11 (1963) (Supreme Court and courts of appeals possess supervisory power); *La Buy v. Howes Leather Co.,* 352 U.S. 249, 259, 77 S.Ct. 309, 315, 1 L.Ed.2d 290 (1957) ("We believe that supervisory control of the District Courts by the Courts of Appeals is necessary to proper judicial administration in the federal system.").

**3.** Following *McNabb,* the Supreme Court repeatedly held that its supervisory authority extended to neither state officials nor state judicial proceedings. *See Ristaino v. Ross,* 424 U.S. 589, 597 n. 9, 96 S.Ct. 1017, 1021 n. 9, 47 L.Ed.2d 258 (1976); *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

court judge, *Offutt v. United States*, 348 U.S. 11, 13, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954).

In cases relevant to the case before us, the Supreme Court has invoked the supervisory power doctrine to protect the integrity of the juries. Long before the Supreme Court decided *Taylor v. Louisiana*, 419 U.S. 522, 529 & 538, 95 S.Ct. 692, 697 & 701, 42 L.Ed.2d 690 (1975), which held that the Sixth Amendment precluded the exclusion of members of distinctive groups of the community from the venires from which the jurys are drawn, the Court applied the supervisory power doctrine in both civil and criminal cases to prevent the systematic exclusion from jury service of members of distinctive groups of the community. In *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), a diversity case, the jury commissioner intentionally excluded from the petit jury lists all persons earning a daily wage. At trial, the plaintiff moved to strike the jury panel. The district court denied the motion, and the Ninth Circuit affirmed. Citing *McNabb*, the Court invoked its supervisory authority and reversed, reasoning that "[j]ury competence is an individual matter rather than a group or class matter ... [and to] disregard [that fact] ... open[s] the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury." *Id.* at 220, 66 S.Ct. at 985. The Court ultimately concluded that the "blanket exclusion of all daily wage earners ... must be counted among those tendencies which undermine and weaken the institution of jury trial." *Id.* at 224, 66 S.Ct. at 987. Later that year the Court decided *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946). *Ballard* involved the exclusion of women from the grand and petit jury lists in the federal courts in California. The Court denounced the practice of excluding women from jury service and found that the practice "deprive[d] the jury system of the broad base it was designed by Congress to have in our democratic society", and operated " 'to destroy the basic democracy and classlessness of jury personnel.' " *Id.* at 195, 67 S.Ct. at 265. Again the Court relied upon *McNabb* and employed the supervisory power doctrine to reverse the defendant's conviction.

*Thiel* and *Ballard* are important for two reasons. First, they illustrate the applicability and scope of the supervisory power doctrine. More important, however, they emphasize the unifying premise in all of the supervisory power cases—that although the doctrine operates to vindicate a defendant's rights in an individual case, it is designed and invoked primarily to preserve the integrity of the judicial system.

**B.** *The Federal Prosecutor's Duty in the Federal Criminal Justice System*

Conceptually related to the purposes for which the supervisory doctrine was created is the federal prosecutor's obligation to serve the cause of justice in our criminal justice system. *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), is the critical case establishing the prosecutor's duty to ensure that justice be done as a higher priority than obtaining a conviction. The defendant in *Berger* claimed that the prosecutor's conduct at trial overstepped the bounds of propriety and fairness and entitled him to a new trial. The Supreme Court agreed, and in the often quoted passage explained the nature of the prosecutor's duty and the values the duty is designed to effect:

> The United States Attorney is a representative not of an ordinary party to the controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that *guilt shall not escape or innocence suffer.* He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. *It is as much his duty to refrain from improper*

*methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.* *Id.* at 88, 55 S.Ct. at 633 (emphasis added).

█ This Court has echoed repeatedly the mandate of *Berger.* We have said that the cherished title "United States Attorney" is not a hunting license which exempts its holder from the ethical constraints of advocacy. *See United States v. Beckett,* 706 F.2d 519, 521 n. 5 (5th Cir. 1983); *United States v. Bursten,* 453 F.2d 605, 610 (5th Cir.1971), *cert. denied,* 409 U.S. 843, 93 S.Ct. 44, 34 L.Ed.2d 83 (1972). Rather, possessing the title is a privilege, and this privilege requires federal prosecutors to adhere to the highest standards of fairness and justice. As we said in *United States v. Corona,* 551 F.2d 1386 (5th Cir. 1977), "[w]e would be remiss if ... we did not recall the 'heavy responsibility [of prosecutors] ... to conduct criminal trials with an acute sense of fairness and justice.' " *Id.* at 1391 (quoting *United States v. Dawson,* 486 F.2d 1326, 1330 (5th Cir.1974)).

C. *Invoking the Supervisory Power Doctrine in this Case*

The Court's general statements concerning the purposes for which the supervisory doctrine was created and the Court's sensitivity to the need to invoke the doctrine to preserve jury integrity, promote fairness, and assure justice compel our invoking the doctrine in this case. Ugly in its practice and insidious in its effects, invidious racial discrimination deserves protection in no area of society, least of all in the administration of justice in federal courts. Almost half a century ago, the Supreme Court spoke unanimously and clearly: "For racial discrimination to result in the exclusion from jury service of otherwise qualified groups ... is at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940). That unequivocal statement and the wisdom of *Thiel* and *Ballard* apply with equal force today. We thus invoke our supervisory power to assure a minimum level of protection against the use of peremptory challenges to practice invidious racial discrimination in individual cases. We recognize that giving effect to the precept of equality conflicts with the total peremptoriness of peremptory challenges on the part of the prosecutor but hold that at some point the threat of invidious discrimination by federal officers sworn to effect justice exceeds the bounds of tolerance.[4]

█ Our holding is narrow and is based upon the factual structure of the case be-

---

**4.** Other courts have exercised their supervisory authority to ensure that federal prosecutors do not employ peremptory challenges to engage in racial discrimination. *See United States v. Jackson,* 696 F.2d 578, 593 (8th Cir.1982), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983); *United States v. Nelson,* 529 F.2d 40, 43 (8th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2631, 49 L.Ed.2d 377 (1976); *United States v. McDaniels,* 379 F.Supp. 1243, 1249 (E.D.La. 1974) (Rubin, D.J.). *See also United States v. Robinson,* 421 F.Supp. 467, 473 (D.Conn.1976), *mandamus granted sub nom. United States v. Newman,* 549 F.2d 240 (2d Cir.), *cert. denied,* 432 U.S. 908, 97 S.Ct. 2956, 53 L.Ed.2d 1081 (1977). The earliest case in which the supervisory power doctrine was mentioned as a method to control the prosecutor's racially motivated exercise of his peremptory challenges was *Hall v. United States,* 168 F.2d 161 (D.C.Cir.), *cert. denied,* 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775 (1948). In *Hall,* federal prosecutors exercised every peremptory challenge against black veniremen and excluded nineteen blacks from the venire. As a result, the defendants, two black men, were tried and convicted by an all-white jury. Although the defendants had timely objected, the district court and a majority of the appellate court panel concluded that the defendants' Fifth Amendment rights were not violated, since the prosecutor was not required to offer any explanation supporting the manner in which he used the peremptories. Judge Edgerton, in a lone dissent, disagreed. *Id.* at 165. He initially argued that the established rules prohibiting the systematic exclusion of blacks from the venire would have no value if those blacks who appeared on the venire could be removed systematically simply because of their race through the prosecutor's uncontrolled exercise of his peremptory challenge. *Id.* at 166. He emphasized the special role United States Attorneys play in the administration of criminal justice, *id.* n. 14 (citing *Berger* ), and urged the court to exercise its supervisory power to examine and curtail such practices. *Id.* The later cases cited above follow the Edgerton position.

fore us. It reflects our recognition that the facts of some cases might justify the prosecutor to consider a prospective juror's race when exercising peremptory challenges. We therefore do not go so far as to hold that racial consideration in every case invariably constitutes invidious racial discrimination. We do not hold that the prosecutor may never consider the veniremen's race as one of the factors affecting his decision to strike or retain those veniremen. But we do not now define those facts or circumstances in particular cases that may authorize prosecutors to consider the prospective jurors' race as one of the factors affecting their decisions to exercise peremptory challenges. The district court bears the responsibility of inquiring into and determining whether a prosecutor has used his peremptory challenges for unjustifiable, racially discriminatory reasons. If the defendant timely objects, the district court must exercise its supervisory authority to determine whether the prosecutor has considered the veniremen's race in employing his peremptory challenges, and if so whether his consideration of race in that case was justifiable.

In this case the district court treated the peremptory challenges as absolute and did not hear the prosecutor's proffered explanation. Since Leslie timely objected and since the prosecutor used all of his peremptory challenges against blacks only, the district court should have pursued the inquiry into the prosecutor's reasons for striking the black veniremen. We cannot determine from the record whether the prosecutor excused these veniremen simply because they were black or even if his actions would have been justified had he considered the veniremen's race as one of the factors that affected his decision to strike these veniremen. We therefore remand the case to the district court with directions to conduct a hearing to determine whether the prosecutor exercised his

peremptory challenges for unjustifiable, racially discriminatory reasons.

This Court by no means intends to emasculate the wide latitude and discretion federal prosecutors enjoy in exercising peremptory challenges in future criminal cases. Nor do we suggest that a criminal defendant has a right to a jury containing all of the economic, social, religious, racial, political, and geographical groups of the community. *See Apodaca v. Oregon*, 406 U.S. 404, 413, 92 S.Ct. 1628, 1634, 32 L.Ed.2d 184 (1972); *Swain*, 380 U.S. at 208, 85 S.Ct. at 829; *Ballard*, 329 U.S. at 192, 67 S.Ct. at 263; *Thiel*, 328 U.S. at 220, 66 S.Ct. at 985. Although the historical roots of the peremptory challenge in the American system of justice run deep, peremptory challenges are not commanded by the Constitution. *See McCray v. New York*, 461 U.S. 961, 103 S.Ct. 2438, 2442 n. 7, 77 L.Ed.2d 1322 (Marshall, J., dissenting from denial of certiorari); *Rosales-Lopez v. United States*, 451 U.S. 182, 188 n. 6, 101 S.Ct. 1629, 1634 n. 6, 68 L.Ed.2d 22 (1981); *Swain*, 380 U.S. at 219, 85 S.Ct. at 835. In the exercise of our supervisory power and in the interest of justice, therefore, we conclude that the federal prosecutor's precious, though not absolute, right to employ peremptory challenges without review must yield in those cases where the defendant can establish that the prosecutor misused those challenges and engaged in invidious racial discrimination.[5]

By resting our holding upon our supervisory power over federal district courts and federal prosecutors we, of course, need not and therefore do not consider whether the prosecutor's conduct in this case violated any of Leslie's constitutional rights. We note, however, that several federal appellate courts and state supreme courts recently have addressed the claim that a defendant's Sixth Amendment right to a jury drawn from a fair cross-section of the com-

---

5. We pretermit the question whether the supervisory power can be invoked when it is established that an accused exercised peremptory challenges with an invidious, racially discriminatory motive. *Cf. United States v. Nobles*, 422

U.S. 225, 231 & 241, 95 S.Ct. 2160, 2166 & 2171, 45 L.Ed.2d 141 (1975) (federal court may invoke supervisory authority and compel *defendant* and prosecutor alike to furnish adversary with investigator's pre-testimony written report).

munity as established in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), necessarily prevents a prosecutor from striking veniremen solely because of their race.[6] Recently, in *Prejean v. Blackburn,* 743 F.2d 1091 (5th Cir.1984), a habeas corpus case, a panel of this Court affirmed the continuing validity of *Swain.*[7] But since this case, unlike *Swain* and *Prejean,* involves a criminal trial in federal court, "the scope of our reviewing power ... is not limited to ascertainment of Constitutional validity." We properly must inquire beyond "those minimal historic safeguards for securing trial by reason" to ensure that the commands of justice are effected. *McNabb,* 318 U.S. at 340, 63 S.Ct. at 642.

## 2. PLEA AGREEMENT LETTERS

Leslie also claims error in the contents and admission into evidence of the plea agreement letters between the government and Gray, Griffin, and the other government witnesses who testified against him. These letters contained promises by the witnesses to testify truthfully at any judicial proceeding or in any interview, and authorized the government to verify by any available means the truthfulness of the witnesses' statements. The letters also provided that the witnesses agreed to forfeit all proceeds, profits, and property acquired through illegal drug transactions and promised to provide the government with detailed personal financial information and records.

Leslie levels two distinct challenges against the letters. First, he claims that the letters were significantly under- and over-inclusive because they did not detail all aspects of the actual agreement between the witnesses and the government and because they contained language that was irrelevant to the concessions made by some of the witnesses. Second, he claims that the language of the letters improperly vouched for the credibility of the government witnesses.

### A. *The Completeness of the Plea Agreement Letters*

Relying upon *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), Leslie argues that the prosecutor did not disclose all of the considerations extended to the government witnesses which might have affected the witnesses'

---

**6.** Several of the courts addressing the issue have concluded that *Taylor* modified *Swain* and prevents a prosecutor from using the challenges in such a manner, *see McCray v. Abrams,* 750 F.2d 1113 (2d Cir.1984) (relying upon the Sixth Amendment); *State v. Neil,* 457 So.2d 481, 486 (Fla.1984) (decided under the state's constitutional counterpart to the Sixth Amendment); *State v. Crespin,* 94 N.M. 486, 488, 612 P.2d 716, 718 (1980) (same); *Commonwealth v. Soares,* 377 Mass. 461, 478 & 488, 387 N.E.2d 499, 511 & 516 (same), *cert. denied,* 441 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *People v. Wheeler,* 22 Cal.3d 258, 272 & 277, 148 Cal.Rptr. 890, 899 & 903, 583 P.2d 748, 758 & 762 (1978) (same), while other courts have rejected the argument and concluded that *Swain* controls any time a defendant seeks to challenge a prosecutor's use of the peremptory challenges. *See Willis v. Zant,* 720 F.2d 1212, 1219 n. 14 (11th Cir.1983); *United States v. Childress,* 715 F.2d 1313, 1320 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984); *Weathersby v. Morris,* 708 F.2d 1493, 1497 (9th Cir.1983); *Hobson v. State,* Ind., 471 N.E.2d 281, 285 (1984); *People v. Williams,* 97 Ill.2d 252, 278, 73 Ill.Dec. 360, 454 N.E.2d 220, 232 (1983); *People v.*

*McCray,* 57 N.Y.2d 542, 549, 457 N.Y.S.2d 441, 445, 443 N.E.2d 915, 919 (1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983); *State v. Kelly,* 362 So.2d 1071, 1077 (La.1978); *see also United States v. Clark,* 737 F.2d 679, 682 (7th Cir.1984) (declining to reach the issue because defendant failed to establish a sufficient likelihood of racial motivation).

**7.** The *Prejean* panel neither cited *Taylor v. Louisiana* nor addressed whether *Taylor* or any other Sixth Amendment case modified *Swain.* *But see* 743 F.2d at 1104 n. 11 (citing cases that have considered this claim). In *Prejean,* the petitioner claimed that the prosecutor's conduct violated his Sixth and Fourteenth Amendment rights. *Id.* at 1103. But in his appeal the petitioner merely invited the court to consider the "racial polarization" between the citizenry and the prosecutors as a substitute for *Swain's* requirement that he demonstrate that prosecutors systematically excluded blacks from petit jury panels over a period of time. The *Prejean* panel did not accept Prejean's invitation to modify *Swain* and concluded that Prejean failed to establish a violation of his constitutional rights under *Swain.*

credibility in the eyes of the jury. In *Giglio*, a witness for the government claimed on cross-examination that he had not secured any agreement with the government in exchange for his willingness to testify against Giglio. The prosecutor made no effort to contradict or clarify the witness's testimony. Evidence discovered by the defendant after the trial indicated that prior to trial the prosecutor had promised the witness either complete immunity or leniency in exchange for the witness's willingness to testify. Concluding that the prosecutor's failure to correct the witness's false statement was incompatible with rudimentary demands of justice, the Supreme Court reversed. The Court reasoned that the prosecutor has a duty to disclose evidence affecting a witness's credibility and that the prosecutor's failure to disclose such evidence warrants a new trial if " 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.' " *Id.* at 154, 92 S.Ct. at 766 (quoting *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959)).

■ An important aspect of the prosecutor's duty under *Giglio*, is to present to the jury as complete a picture as possible of the plea agreement between the witness and the government. *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977); *United States v. Nicholson*, 525 F.2d 1233, 1236 (5th Cir.), *cert. denied*, 425 U.S. 972, 96 S.Ct. 2170, 48 L.Ed.2d 795 (1976). The prosecutor may satisfy this obligation by introducing either testimonial evidence of the plea agreement, *Nicholson*, 525 F.2d at 1236, or a plea agreement letter which memorializes the respective promises of the witness and the government. *United States v. Martino*, 648 F.2d 367, 389 (5th Cir.1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982). Regardless of which method the prosecutor chooses to prove the existence and the details of the plea agreement, *Giglio* requires the prosecutor to ensure that the disclosure of the plea agreement to the jury is accurate and complete.

■ In this case, each government witness with whom the government had negotiated a plea agreement testified on direct examination that the plea agreement letter constituted the entire agreement between himself and the government. Leslie's cross-examination of the various government witnesses, however, revealed that the agreements were significantly under- and over-inclusive of the respective promises made by the government and the witnesses. Griffin, for example, had been charged in three multiple-count indictments of extensive narcotics smuggling, possession, and distribution offenses, including the importation of hundreds of pounds of cocaine and tens of tons of marihuana. Griffin's plea agreement indicated that he pled guilty to one count in each of the three indictments, and these three counts carried a maximum sentence of 45 years. The agreement failed to mention, however, that Griffin had agreed to cooperate with the government largely because of the favorable treatment the government promised to provide his wife, son, and daughter. Like Griffin, his wife, son, and daughter had been charged in several multiple-count indictments for various narcotic offenses, and each was held on a very high bond. Griffin's wife's and son's bonds were set at $1,000,000 each, and his daughter's bond was set at $250,000. After Griffin negotiated his plea with the government and agreed to testify as a government witness, his wife's and son's bonds were reduced to $100,000, and his daughter's bond was reduced to $25,000. In addition, all of the felony charges against Griffin's wife, son, and daughter were dismissed, and each was allowed to plead guilty to a single misdemeanor count. Leslie revealed all of this information to the jury through Griffin's cross-examination, and he argued the issue to the jury during his closing argument.

Other plea agreements between the government and its witnesses demonstrated that the letters did not disclose all aspects of the negotiated plea. Gray's plea agreement, for example, did not reveal that in exchange for his promise to testify for

the government, his bond had been reduced from $1,000,000, which he could not satisfy, to $100,000, which he could. *See, e.g., United States v. Garza,* 574 F.2d 298, 301 (5th Cir.1978) (witness's bond reduction as an aspect of the plea agreement, which permitted witness to gain freedom, was an important factor bearing upon the witness's motive and credibility and should have been revealed to the jury). Gray and another government witness who had executed a plea agreement letter with the government also testified that all of the language in their respective plea agreement letters referring to the forfeiture of assets and the production of financial information neither was negotiated by them nor was relevant to their agreement, since neither witness had bank accounts or other assets which were acquired through illegal drug transactions. Leslie revealed the under- and over-inclusiveness of these plea agreement letters to the jury through his cross-examination of these witnesses.

While we are disturbed by the apparent under- and over-inclusiveness of the submitted plea agreement letters, we find no *Giglio* violation in this case. *Giglio* would require a new trial in this case if there was any reasonable likelihood that the government's failure to correct the misinformation concerning the plea agreements affected the judgment of the jury. If a defendant successfully elicits all aspects of the plea agreement during the witnesses' cross-examination, however, any error in nondisclosure is harmless and not likely to affect the judgment of the jury. *United States v. Decker,* 543 F.2d 1102, 1105 (5th Cir.1976), *cert. denied,* 431 U.S. 906, 97 S.Ct. 1700, 52 L.Ed.2d 390 (1977); *see also United States v. Miranne,* 688 F.2d 980, 989 (5th Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 736, 74 L.Ed.2d 959 (1983). In this case, Leslie disclosed all aspects of the plea agreements through his effective and thorough examination of the government witnesses, and in his closing argument he asserted that the government's promises provided each witness with an incentive to fabricate his story and falsely implicate Leslie. In view of Leslie's cross-examination and closing argument, we find no reasonable likelihood that the under- and over-inclusiveness of the plea agreement letters could have affected the judgment of the jury.[8]

**B.** *Improper Vouching for the Credibility of the Government Witnesses*

In Leslie's alternative challenge to the admission into evidence of the plea agreement letters, he claims that the letters improperly vouched for the credibility of the government witnesses because the witnesses (1) promised to testify truthfully at any judicial proceeding, (2) were subject to perjury charges if they breached that promise, and (3) understood that the government reserved the right to test their veracity and the accuracy of their statements by "any means [it] saw fit." We find nothing improper in these plea bargained promises.

---

**8.** We note that *United States v. Garza,* 574 F.2d 298 (1978), does not require a contrary result. In *Garza,* the government introduced into evidence the plea agreement letters of two of its witnesses. The defendant's cross-examination of these witnesses revealed substantial discrepancies between the plea letters and the actual agreements the witnesses had made with the government. The defendant then prepared and submitted several exhibits which accurately stated the benefits the witnesses would receive as a result of their cooperation with the government. When the jury retired, the court permitted the plea agreement letters to accompany the jury to the jury room but over the defendant's timely objection, did not permit the defendant's exhibits concerning the plea bargain to be taken to the jury room. This, we held, was reversible error. We concluded that despite the defendant's thorough and extensive cross-examination of the government's witnesses, the court's selective submission of only the government's exhibits was "tantamount to suggesting that the letter[s] contained the entire agreement between the government and the [witnesses]." *Id.* at 301. In this case, Leslie offered no documentary evidence which contradicted the terms of the plea agreement letters. The manner in which he challenged the accuracy and completeness of the plea letters was through the witnesses' cross-examination. Since the district court in this case did not, indeed could not, selectively submit to the jury the evidence related to the plea agreement letters, we find this case factually inapposite to *Garza.*

 An attempt to bolster a witness by vouching for his credibility ordinarily is improper and constitutes error. *United States v. Ellis*, 547 F.2d 863, 869 (5th Cir. 1977). The test for improper vouching is whether the prosecutor's expression might reasonably have led the jury to believe that the prosecutor possessed extrinsic evidence, not presented to the jury, that convinced the prosecutor of the defendant's guilt. *Id.; see also United States v. Shaw*, 701 F.2d 367, 391 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). A prosecutor, therefore, may not make explicit personal assurances of a witness's veracity. *See United States v. Lamerson*, 457 F.2d 371, 372 (5th Cir.1972); *Gradsky v. United States*, 373 F.2d 706, 709 (5th Cir.1967).

 The first two of Leslie's three points are easily disposed of. A witness's promise in a plea agreement letter to testify truthfully at any judicial proceeding in which he or she may be called as a witness is the same promise he or she makes when called as a witness at trial. As such, a mere promise to testify truthfully does not amount to improper vouching. *See Martino*, 648 F.2d at 389. Closely related to the witness's promise to testify truthfully is the witness's understanding of the penalty for breaching that promise—perjury charges. A witness's written acknowledgement of his understanding of the penalty for testifying falsely obviously is not an improper vouching for the credibility of the witness's testimony.

 The more difficult question is raised by Leslie's third point. It concerns the effect of the language in the plea agreement letter which authorized the government "to verify by any means it [saw] fit any statements or testimony given by the [witness]." We conclude that this language standing alone did not constitute improper vouching for the witnesses' credibility. In contrast is the case of *Gradsky v. United States, supra*, in which we held that the following statement by the prosecutor to the jury improperly bolstered the credibility of the government witnesses and required reversal:

> [T]he government ha[d] every opportunity to check out and to judge the credibility and truthfulness of [its witnesses] in this case, and in that context, we offered you [the jurors] their testimony.

373 F.2d at 710. We reasoned that the prosecutor's statement implied that the government *had, in fact*, independently verified the story that the government witnesses conveyed to the jury.

Leslie fails in his attempt to characterize the language at issue in this case as having the same meaning as the language we found offensive in *Gradsky*. Merely reserving the right to test independently the veracity of a witness's testimony neither implies that the right has been exercised nor reasonably could lead the jury to believe that the prosecutor possessed extrinsic evidence that convinced the prosecutor of the defendant's guilt. In fact, in this case the prosecutor repeatedly cautioned the jury in both his opening and closing arguments to examine independently the prosecution's witnesses and judge their credibility based upon the evidence presented. *See United States v. Sims*, 719 F.2d 375, 377 (5th Cir.1983) (prosecutor's suggestion to jury that government witness's testimony was circumspect and that the jury should examine testimony closely removed any doubt that neither prosecutor nor plea agreement letter served to vouch for the credibility of the government witness), *cert. denied*, —— U.S. ——, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984). *Ellis*, 547 F.2d at 869 (same). In view of the prosecutor's cautionary remarks and the neutral nature of the statement in the plea agreement letters, we find that neither the prosecutor nor the plea agreement letters impermissibly vouched for the credibility of the government witnesses.

### 3. IMPEACHMENT OF A PROSECUTION WITNESS

Leslie's final claim is that the district court erred by refusing to permit him to impeach Giron's testimony by calling Mor-

iarty, Giron's attorney, to testify. The hearing conducted by the district court outside the jury's presence demonstrates that Moriarty would have testified that (1) Giron responded "Yes" when Moriarty asked: "Are you [Giron] willing to testify in this case against Leslie?" and (2) Moriarty thought that Giron understood that he (Giron) was required to testify in this case against Leslie in order to secure the plea agreement. Giron had testified on cross-examination that at the time he consummated the plea agreement with the government he did not know that he would be called as a government witness in Leslie's case. Leslie claims that Moriarty's testimony was necessary to impeach Giron's testimony and show Giron's bias against Leslie.

 Any incentive a witness may have to falsify his testimony, commonly referred to as bias, *United States v. Canales*, 744 F.2d 413, 425 (5th Cir.1984), is relevant to the witness's credibility and the resulting weight the jury should accord to the witness's testimony. *United States v. Hall*, 653 F.2d 1002, 1008 (5th Cir.1981); *United States v. Diecidue*, 603 F.2d 535, 550 (5th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980); 3 J. Weinstein, *Weinstein's Evidence* ¶ 607–03, at 607–23 (1982). As such, the party challenging the witness should be afforded an opportunity to pursue all relevant lines of inquiry aimed at discovering and disclosing such bias. *Hall*, 653 F.2d at 1008. The defendant seeking to demonstrate the existence of a bias may impeach a witness's claim of no bias either by effective cross-examination, *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *United States v. Andrew*, 666 F.2d 915, 924 (5th Cir.1982), or by introducing extrinsic evidence demonstrating the witness's bias. *United States v. Lay*, 644 F.2d 1087, 1090 (5th Cir.), *cert. denied*, 454 U.S. 869, 102 S.Ct. 336, 70 L.Ed.2d 172 (1981); *Diecidue*, 603 F.2d at 550. The district court has broad discretion in determining how bias may be proved and what extrinsic evidence is material to that purpose. The district court's judg-

ment will be disturbed only where the defendant can show an abuse of discretion. *United States v. Landes*, 704 F.2d 152, 154 (5th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 176, 78 L.Ed.2d 158 (1983); *Diecidue*, 603 F.2d at 550; *United States v. Love*, 599 F.2d 107, 108 (5th Cir.), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312 (1979).

This case concerns the propriety of using certain extrinsic evidence, rather than extended cross-examination, to impeach Giron's testimony and show Giron's bias. In his first claim, Leslie argues that Moriarty's hearing testimony would have demonstrated that Giron made a prior, out of court statement that was inconsistent with his trial testimony and would have tended to show his bias. Because Leslie laid no foundation for the introduction of Giron's prior statement, we reject this claim and hold that the district court properly excluded Moriarty's testimony related to Giron's statement.

Fed.R.Evid. 613(b) provides, in part:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require.

Rule 613(b) establishes three criteria that must be met before evidence of the prior statement is admissible:

> (1) [The statement] must be a prior inconsistent statement of the witness;
>
> (2) The witness must be afforded an opportunity to explain or deny [having made] the statement; and
>
> (3) The opposing party must be afforded an opportunity to interrogate the witness concerning the statement.

*United States v. Rice*, 550 F.2d 1364, 1374 (5th Cir.), *cert. denied*, 434 U.S. 954, 98 S.Ct. 478, 54 L.Ed.2d 312 (1977). In *United States v. Lay, supra*, 664 F.2d at 1090, we concluded that Rule 613(b) and its foundation requirements apply in cases where the

defendant seeks to introduce extrinsic evidence to impeach a witness's trial testimony and demonstrate bias. *See also* 3 J. Weinstein, *supra,* ¶ 607–03, at 607–43 (arguing that Rule 613(b) applies to bias claims and requires party seeking to establish bias to lay a proper foundation before extrinsic evidence may be offered).

█ Leslie failed to satisfy the first two aspects of the foundation requirement. As the district court found, Giron's trial testimony that he did not know at the time he consummated the plea agreement with the government that he would be called as a government witness in Leslie's case is not inconsistent with his response to Moriarty's question. At the time the agreement was made, Giron could have been willing to testify against Leslie but might not then have known that he in fact would be called as a government witness in Leslie's case and expected to testify against Leslie. Leslie also failed to afford Giron an opportunity to explain or deny making the statement, a specific requirement of Rule 613(b). Leslie, therefore, was not allowed to offer extrinsic evidence showing that Giron had made the statement. *See United States v. Balliviero,* 708 F.2d 934, 940 (5th Cir.) (since witness merely could not recall having made prior and allegedly inconsistent statement, rather than having denied making statement, defendant was properly barred from offering extrinsic evidence demonstrating that witness had made statement), *cert. denied,* — U.S. —, 104 S.Ct. 351, 78 L.Ed.2d 316 (1983).

After Moriarty was excused as a witness at the hearing, the district court on three successive occasions offered Leslie the opportunity to question Giron. On each occasion, Leslie declined the opportunity and essentially waived his chance to ask Giron to explain or deny making the statement. Having failed to satisfy this minimal foundation requirement, Leslie cannot successfully argue that the district court abused its discretion in preventing him from calling Moriarty to testify about Giron's alleged prior statement.

█ Leslie also claims that Moriarty should have been permitted to testify at trial about Giron's understanding of the requirements of the plea agreement. Moriarty would have testified that he thought that Giron understood that he (Giron) would be required to testify against Leslie before the government would accept Giron's guilty plea. Other than Giron's response to the question concerning his "willingness" to testify against Leslie, Moriarty neither pointed to any other colloquy between himself and Giron nor reported any observation of Giron which supported his belief that Giron knew that the plea agreement was predicated upon his agreeing to testify against Leslie in this case. Moriarty's hearing testimony demonstrates that his perception of his client's understanding of the plea agreement was, at best, speculative. We find, therefore, that the district court did not abuse its discretion in denying Leslie's request to call Moriarty as a witness. The court properly weighed the minimal probative value of Moriarty's hearing testimony against its potentially prejudicial impact. *See Landes,* 704 F.2d at 154; *Diecidue,* 603 F.2d at 550.

### III.

█ In summary, we hold that district courts must exercise their supervisory power to ensure that prosecutors do not misuse peremptory challenges to engage in invidious racial discrimination. We reverse and remand with instructions for the district court to conduct a hearing consistent with this opinion for the purpose of determining whether the prosecutor in this case exercised his peremptory challenges for impermissible, racially discriminatory reasons. If the conclusion is that he did, there must be a new trial. In all other respects, the judgment of the district court is affirmed.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.